RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

MAX RACK, INC.,

        *Plaintiff-Appellee/Cross-Appellant*,

  *v.*

CORE HEALTH & FITNESS, LLC,

        *Defendant-Appellant/Cross-Appellee*.

Nos. 20-3598/3600

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:16-cv-01015—Algenon L. Marbley, District Judge.

Argued: July 28, 2021

Decided and Filed: July 14, 2022

Before: COLE, ROGERS, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Robert Collings Little, BUCHALTER, Los Angeles, California, for Appellant/Cross-Appellee. Matthew J. Schonauer, SCHONAUER LAW LLC, Columbus, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Robert Collings Little, C. Dennis Loomis, BUCHALTER, Los Angeles, California, for Appellant/Cross-Appellee. Matthew J. Schonauer, SCHONAUER LAW LLC, Columbus, Ohio, for Appellee/Cross-Appellant.

     MURPHY, J., delivered the opinion of the court in which ROGERS, J., joined, and COLE, J., joined in part. COLE, J. (pp. 35–37), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  Trademarks allow consumers to distinguish one product from another quickly and cheaply.  But they could not perform this signaling function if a trademark owner's competitors could freely use the owner's mark to sell their (potentially inferior) goods.  So the Lanham Act has long prohibited trademark infringement and given trademark owners a variety of remedies to combat it.  *See* 15 U.S.C. §§ 1114(1), 1117(a), 1125(a)(1)(A).  This case raises several challenging questions under the Lanham Act.

Steve Skilken, the owner of Max Rack, Inc., invented a piece of gym equipment that he named the "Max Rack."  For years, his company sold Max Racks through a licensing agreement with Core Health & Fitness, LLC.  When Max Rack's last patent expired, however, Core Health decided to compete against Max Rack by selling an identical machine under a new name—the "Freedom Rack."  Max Rack alleged that Core Health committed two types of infringement during its transition to the Freedom Rack: it continued to sell "Max Racks" without authorization, and it attempted to sell Freedom Racks by free riding off the "Max Rack" name.  A jury agreed, awarding Max Rack $1 million in damages and $250,000 in Core Health's profits.  The district court upheld the jury's liability finding, doubled its profits award to $500,000, and granted attorney's fees to Max Rack.  But the court overturned Max Rack's damages award.  Both sides have appealed, and we must address several liability and remedy issues.  All told, we affirm in part and reverse in part.

I

A

Many avid weightlifters prefer to use free weights (think of a bench press with a standard barbell) over weightlifting machines (think of a chest-press machine) because free weights allow for more natural motions and help weightlifters develop better balance.  Yet free weights also pose greater dangers.  Weightlifting machines are designed to ensure that weights will come

safely to rest when lifters can no longer hold them. If, by contrast, lifters without a "spotter" can no longer hold free weights, the weights can come crashing down and cause serious injury.

Inventors thus have long sought to develop equipment that combines the freedom of free weights with the safety of weightlifting machines. Take a classic "Smith Machine":



Article, R.40-10, PageID 695. It attaches the ends of an Olympic-size barbell to two vertical "guide rods." Skilken Tr., R.99, Page ID 2202. The guide rods are themselves connected to two sturdy vertical posts that stand eight or so feet in height and six or so feet apart. The barbell moves up and down along the guide rods. Safety latches on both sides of this barbell can connect to any in a series of paired hooks (or catches, depending on the model) placed from top to bottom on the vertical posts. The posts hold the barbell on these hooks when it is not in use. Weightlifters can perform exercises like squats with this machine by lifting the barbell off the posts and twisting it with their wrists to separate the barbell's safety latches from the hooks. When they complete a set (or can no longer hold the weight), they need only twist the barbell until its latches reconnect with the closest pair of hooks. The vertical posts will again hold the barbell's weight.

Steve Skilken thought that he could make a machine with similar safety features but that better simulated the use of free weights. Born and raised in Columbus, Skilken was an athlete at

The Ohio State University and continued to exercise after his graduation. While lifting at a local gym, a friend introduced him to a Smith Machine. Skilken soon came up with an idea to improve on its design. A Smith Machine allows the barbell to move only vertically (up and down), not horizontally (forward or backward). But when lifters use free weights to do exercises like lunges, the barbell will often move both up and down *and* forward and backward.

In the late 1980s and early 1990s, Skilken spent significant time designing a machine that allowed a barbell to move both ways. His efforts resulted in the "Max Rack." The patent for this machine contained a picture of its design:



Patent, R.93-5, PageID 1522. In later years after significant product development, a commercially available "Max Rack" looked like this:



Website, R.93-3, PageID 1519.

Like the Smith Machine, Skilken's design connects each side of a standard barbell to two vertical guide rods. Unlike the Smith Machine, the Max Rack has two sets of vertical posts, one in the front and the other a few feet behind. The Max Rack connects the vertical guide rods attached to the barbell to horizontal guide rods that run along the top and bottom of the front and back posts. The vertical rods can move forward and backward along these horizontal rods. This design permits the barbell that holds the weights to move not just up and down along the vertical rods, but also forward and backward along the horizontal ones. The Max Rack thus allows lifters to perform more exercises with the barbell and creates a closer feel to traditional free weights.

In 1997, Skilken's company (which he also named "Max Rack") received its first patent on the machine and registered the "Max Rack" trademark. By 2002, however, the Max Rack remained a relatively unknown piece of gym equipment. Kirt Moritz joined the company to take over marketing efforts. Four years later, the company had spent over $1 million developing and promoting the product. Among its promotional efforts, Max Rack advertised the machine on the internet, in magazines and trade journals, through late-night infomercials, and at trade shows.

These efforts began to pay off. Professional sports teams (like the Green Bay Packers) and universities (like Ohio State) added Max Racks to their weight rooms. The sales of Max Racks also continued to increase from year to year. The company sold only 25 Max Racks in 1999. By 2005, its annual sales had increased to 84. During these years, it sold a total of 365 Max Racks.

In 2005, Star Trac Strength, Inc., approached Skilken about teaming up to grow Max Rack sales. Early the next year, Max Rack and Star Trac entered into a licensing agreement. Star Trac received the exclusive right to make and distribute the Max Rack. In exchange, it agreed to pay Max Rack a royalty of $120 per unit sold and to take over marketing efforts. The agreement would continue until the expiration of the last Max Rack patent, at which point either party could opt out.

Financial troubles hit Star Trac four years later. These troubles led the two companies to sign an "addendum" to their agreement in 2010. Max Rack agreed to accept a several-month delay in the payment of some $44,000 in royalties. Star Trac agreed to pay the $120 royalty in

perpetuity (not just until the last patent's expiration).  Soon thereafter, Core Health bought Star Trac's assets, including its licensing agreements.  As part of its due diligence, Core Health reviewed this addendum.  It did not believe that courts would enforce the requirement to pay royalties forever because of caselaw barring patent holders from seeking royalties after their patent's expiration.  Core Health did not inform Max Rack of this belief.

Max Rack's relationship with Core Health prospered for several years.  From 2006 to 2015, Star Trac and Core Health sold over 5,300 Max Racks under the licensing agreement.  Max Rack received over $640,000 in royalties.

Things changed in October 2015.  Core Health sent Max Rack a letter stating its intent to get out of the agreement.  The last patent on the machine would expire on November 21.  Core Health did not plan to use the "Max Rack" mark on, or pay royalties for, machines made after that date.  The agreement did, however, include a six-month window for Core Health to sell off remaining "Max Rack" machines that Core Health had started manufacturing before the agreement's expiration (as long as it paid royalties to Max Rack).

B

Going forward, Core Health planned to make an identical machine using a new trademark: the "Freedom Rack."  Max Rack challenged the way in which Core Health executed this change.  Max Rack had concerns both with Core Health's marketing and with its manufacturing.

1. Max Rack contended that Core Health did not stop using the Max Rack trademark in its marketing quickly enough.  Core Health's former vice president of marketing could not remember taking any action between July and December 2015 to change to the Freedom Rack mark, even though switching a brand name can take up to two months. Emails suggest that Core Health waited until over a month after the agreement's expiration to update its website and other marketing materials.  In January 2016, a marketing team attempted to scrub all marketing materials of the old mark.  This review took two weeks.

But the employees did not catch everything. Max Rack's Kirt Moritz claimed that, for years, he would search Google for "Max Rack" and get back "hits" in which this mark was used with the Freedom Rack. He kept a record of one search from mid-2016. This search returned a link to Core Health's website with a caption underneath the link that used the "Max Rack" name. Core Health's former vice president of marketing suggested that this link sent viewers to a sales page (but Max Rack did not introduce a copy of the page). He also noted that Core Health's sales page for the Freedom Rack at one point contained an outdated picture of a machine with a partially covered "Max Rack" logo on the bottom bar.

These issues were not limited to Core Health. Moritz's Google searches revealed that some third-party resellers, including OC Fitness Source, advertised the Freedom Rack using the Max Rack name. When Moritz visited OC Fitness's site, he saw that it used a picture of the Max Rack.

Core Health's former vice president of marketing admitted that someone in marketing should have done the types of Google searches that Moritz undertook. But the employee in charge of the changeover could not remember doing so. Max Rack's counsel confronted this employee with some remaining "Max Rack" references on Core Health's website during her deposition. She later testified that she fixed all references that she learned of and explained that they had resulted from "[h]uman error." O'Brien Tr., R.101, PageID 2573.

Other errors remained. As late as trial, Moritz testified, the owner's manual for the Freedom Rack, which could be found on Core Health's website, included a reference to "Max Rack." One line in the manual's installation instructions read: "UNPACK THE MAX RACK and ASSEMBLE UPPER WELDMENTS." Manual, R.95-1, PageID 1813. The manual used the "Freedom Rack" mark in many other places, however, including on its title page.

2. Max Rack also had production complaints. Kevin Corbalis, Core Health's vice president of product development, testified that, by December 2015, the overseas manufacturer had finished all remaining Max Racks and begun to make Freedom Racks.

Yet company emails undermine this claim. They show Core Health scrambling to change its production from Max Racks to Freedom Racks into 2016. A December 23, 2015 email, for

example, suggests that the company still needed to size the new "Freedom Rack" artwork to fit the machine. Email, R.94-11, PageID 1752. Five days later, another email reiterates: "Need name change, logo, MaxRack removed from placard ASAP so no more are produce[d]." Email, R.94-12, PageID 1754.

Correspondence in 2016 muddies things further. Emails from January suggest that Core Health had still not assigned the "Freedom Rack" a product number or sent engineering changes to the manufacturer. By February, the company was still trying to figure out the Freedom Rack's standard cost and to ensure that the "next production runs" were of Freedom Racks. Emails, R.95-5, PageID 1833–1834; R.94-18, PageID 1771. A year after the agreement's expiration, Corbalis asked employees for the "last manufacture date of the Max Rack[.]" Email, R.95-4, PageID 1832. An employee responded that Core Health had not authorized the manufacturer to "scrap all remaining Max Rack labels" until May 2016. *Id.*, PageID 1831.

Core Health's records show that, after the agreement expired in 2015, it sold 271 machines made as Max Racks. The agreement gave Core Health six months to sell off any units that it had started making before the expiration date. It sold 238 within that window. But it sold another 24 later in violation of the agreement. Core Health placed the remaining 9 units in a unique category because Core Health's records suggested that it changed their labels to "Freedom Rack" before shipping them. Until this litigation, Core Health did not pay Max Rack for any of these 271 sales.

Today, the Freedom Rack is the only machine on the market like the Max Rack. Skilken has not tried to enter into another licensing agreement to make "Max Racks." And no competitors sell a similar product.

C

Max Rack sued Core Health (and two other parties that do not matter now). As relevant here, Max Rack alleged two claims under the federal Lanham Act: for infringing its Max Rack trademark and engaging in unfair competition. *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). It also alleged three claims under Ohio's Deceptive Trade Practices Act: for passing off the Max Rack machine as its own, causing a likelihood of confusion as to the source of Core Health's

machines, and causing a likelihood of confusion as to Core Health's affiliation with the Max Rack mark. *See* Ohio Rev. Code § 4165.02(A)(1)–(3).

These claims proceeded to trial. The week before trial started, Core Health sent Max Rack a belated check for the 262 units that it sold and shipped as Max Racks after the agreement's expiration. For the 238 that it sold within the six-month window allowed by the agreement, Core Health paid the royalty plus interest. For the 24 that it sold in breach of the agreement, it paid its profits plus interest.

After trial, the jury ruled for Max Rack on all counts. It awarded Max Rack $1 million in damages and $250,000 in Core Health's profits. It also found that Core Health's infringement had been intentional.

The parties filed competing post-trial motions. The district court ruled for each side in part. *Max Rack, Inc. v. Core Health & Fitness, LLC*, 2020 WL 2128614, at *12 (S.D. Ohio May 5, 2020). The court ruled for Max Rack on most issues. It denied Core Health's motion for judgment as a matter of law or for a new trial as to its liability. *Id.* at *2–5. The court also upheld Max Rack's $250,000 award tied to Core Health's profits. *Id.* at *5. It even enhanced this award to $500,000 because of Core Health's conduct during discovery. *Id.* at *6–7. The court next awarded Max Rack attorney's fees. *Id.* at *7–8. It lastly enjoined Core Health from using the Max Rack mark without acknowledging that it is registered to Max Rack, Inc. *Id.* at *11.

At the same time, the district court ruled for Core Health regarding Max Rack's award of $1 million in damages. The court overturned this award because Max Rack presented no evidence that Core Health's use of the Max Rack mark had actually confused any consumers. *Id.* at *4–5. It later rejected Max Rack's motion for reconsideration on this damages question. *Max Rack, Inc. v. Core Health & Fitness, LLC*, 2020 WL 4933920, at *5 (S.D. Ohio Aug. 24, 2020).

II

Both parties appealed. Their combined appeals require us to consider six questions: (1) Did Max Rack present sufficient evidence that Core Health violated the law? (2) Is Core

Health entitled to a new trial?  (3) Should the district court have vacated the jury's profits award?  (4) Did the court properly double that profits award?  (5) Did the district court mistakenly vacate the jury's damages award?  (6) And did it wrongly grant attorney's fees to Max Rack?

***Question 1:  Did Max Rack present sufficient evidence that Core Health violated the law?***

Core Health begins by arguing that the district court should have granted it judgment as a matter of law under Federal Rule of Civil Procedure 50 because no reasonable jury could have found for Max Rack.  Recall that Max Rack presented to the jury two federal claims under the Lanham Act (for trademark infringement and unfair competition) and three state claims under Ohio's Deceptive Trade Practices Act (for passing off goods, causing likelihood of confusion as to source, and causing likelihood of confusion as to affiliation).  *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A); Ohio Rev. Code § 4165.02(A)(1)–(3).  Whether the jury could have reasonably found for Max Rack on any one of these claims turns on that claim's specific legal elements.  After all, Core Health would be entitled to a judgment in its favor on a claim if Max Rack failed to produce enough evidence on even a single element, whether or not it proved the other elements.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anchor v. O'Toole*, 94 F.3d 1014, 1023 (6th Cir. 1996).

But the parties do not cite the statutory text for any of the five claims, identify their legal elements, or otherwise distinguish between them.  To seek judgment as a matter of law, Core Health argues generically that its use of the Max Rack mark was not likely to cause confusion as a matter of law, impliedly suggesting that all five claims contain an identical "likelihood of confusion" element.  And Max Rack's response does not challenge Core Health's (implied) suggestion that the five claims share this identical element.

Do the parties rightly assume that the claims follow the same likelihood-of-confusion test?  Perhaps so for the federal claims.  The two federal statutes use similar "likely to cause confusion" language.  *Compare* 15 U.S.C. § 1114(1)(a), *with id.* § 1125(a)(1)(A); *see* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1 (5th ed.), Westlaw (database updated Mar. 2022).  And an oft-cited treatise identifies as their primary difference that § 1114(1)(a) permits only owners of federally *registered* marks to bring

infringement claims, whereas § 1125(a) allows owners of *unregistered* marks to assert these claims under the "unfair competition" label. 1 McCarthy, *supra*, § 4:6; 5 *id.* §§ 27:12, 27:14; *cf. Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280, 288 (6th Cir. 1997). (The treatise cautions that, when an owner of a registered mark asserts a trademark-infringement claim, the court should not present to the jury duplicative trademark-infringement claims under § 1114(1)(a) and § 1125(a) because it might confuse jurors. 5 McCarthy, *supra*, § 27:14.)

Things are more complicated for the state claims. A recent Ohio Supreme Court decision has told courts not to follow federal precedent reflexively if Ohio's Deceptive Trade Practices Act uses language different from the Lanham Act. *See Wooster Floral & Gifts, L.L.C. v. Green Thumb Floral & Garden Ctr., Inc.*, 172 N.E.3d 60, 66–69 (Ohio 2020). But again, the parties do not even cite the statutory language governing these state claims. Ultimately, therefore, we will not identify the elements for any of the claims in this case. The parties' briefing choices allow us simply to assume that all five of Max Rack's claims required it to prove the same likelihood-of-confusion element that governs an infringement claim under § 1114(1)(a). Their briefing choices likewise allow us to assume that Max Rack proved all other (unspecified) elements.

In a typical trademark-infringement case, a company using one mark (say, "5-hour ENERGY") alleges that another company has chosen a deceptively similar mark (say, "6 Hour POWER") that will lead consumers to believe goods or services bearing the marks are affiliated with each other. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 731 (6th Cir. 2012); *see also, e.g.*, *AWGI, LLC v. Atlas Trucking Co.*, 998 F.3d 258, 268 (6th Cir. 2021) ("Atlas" versus "Atlas Trucking" and "Atlas Logistics"); *Daddy's*, 109 F.3d at 278–79 ("Daddy's Junky Music Stores" and "Daddy's" versus "Big Daddy's Family Music Center"). In that context, we have evaluated the totality of the circumstances to decide whether a new mark would generate a "likelihood of confusion" as to its affiliation with the established mark. *See Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1106–07 (6th Cir. 1991). We have also asked eight recurring questions to help ensure consistent results across cases under this consider-everything approach: How well-known is the plaintiff's mark? How related are the parties' goods? How similar are the marks? Have consumers actually been confused? Do the parties

use similar marketing channels? How much care do consumers exercise when buying these products? Did the defendant intentionally choose its mark because of the plaintiff's? And are the companies' product lines likely to expand? *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982).

But this case is not a typical one. Max Rack does not allege that Core Health's "Freedom Rack" mark is deceptively similar to its "Max Rack" mark. It has no objection to that new mark. Rather, Max Rack alleges that Core Health continued to use the "Max Rack" mark after the expiration of the agreement that gave it the right to do so.

A separate body of law has developed for this distinct claim that a holdover licensee has continued to use a licensor's mark after their agreement expired. *See* 4 McCarthy, *supra*, § 25:31 (citing cases). In this context, courts have jettisoned the usual totality-of-the-circumstances test in favor of a more categorical rule: "proof of continued, unauthorized use of an original trademark by one whose license to use the trademark had been terminated is sufficient to establish 'likelihood of confusion.'" *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997); *ITT Indus., Inc. v. Wastecorp. Inc.*, 87 F. App'x 287, 293 (3d Cir. 2004); *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492–93 (11th Cir. 1983); *Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975); *L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009). This rule makes good sense when a holdover licensee blatantly infringes the licensor's mark by using that mark in the same way as it did before the agreement expired. Without any need to tick through factors, it should be obvious that consumers will believe, for example, that a pizza restaurant remains affiliated with the "Little Caesars" chain when a terminated franchisee continues to operate the pizzeria as a Little Caesars. *See Little Caesars Enters., Inc. v. Miramar Quick Serv. Rest. Corp.*, 2020 WL 4516289, at *3 (6th Cir. 2020) (order).

How do these principles play out here? Before applying them to Max Rack's claims, we must begin with uncertainty over our standard for evaluating the jury's verdict. Circuit courts have disagreed over the proper standard of review for the ultimate question whether a likelihood of confusion exists. *See* 4 McCarthy, *supra*, §§ 23:71, 23:73. Traditionally, we have viewed this

question as one of law that we have considered de novo. *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 427 (6th Cir. 2017); *Homeowners Grp.*, 931 F.2d at 1107; *Frisch's*, 670 F.2d at 651. But a recent Supreme Court case suggests that the question could at least sometimes raise a fact question for the jury that we would review deferentially. *See Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015). Regardless, Max Rack produced enough evidence to establish a likelihood of confusion even under our traditional standard. *See Homeowners Grp.*, 931 F.2d at 1107.

Max Rack presented two theories to the jury: (1) that Core Health sold some Max Racks without authorization, and (2) that Core Health used the Max Rack mark when selling Freedom Racks to confuse consumers into thinking that the Freedom Rack was affiliated with the Max Rack brand. The district court relied on the second theory, but we think it easier to start with the first.

*Theory One: Continued Sales of Max Racks*. The jury reasonably could have found that Core Health violated the licensing agreement by selling Max Racks after that agreement expired. This violation would trigger our rule that trademark infringement exists if a holdover licensee continues to use a licensor's mark on its goods without authorization. *See U.S. Structures*, 130 F.3d at 1190. Most notably, Core Health admits that it sold 24 Max Racks outside the six-month window that the agreement gave it to liquidate inventory. These unauthorized sales alone supported the jury's finding that Core Health intentionally infringed the Max Rack mark by leading the public "to think that the continuing user [Core Health] is still connected with the trademark owner [Max Rack]." 4 McCarthy, *supra*, § 25:31; *see also Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 154–55 (3d Cir. 1984). In fact, Core Health paid Max Rack its profits on these units before trial. That decision may have reduced its monetary liability, but it did not erase its violation.

In addition, the jury reasonably (if just barely) could have found that Core Health began to *manufacture* Max Racks after the agreement expired in November 2015. Core Health agrees that it sold 238 Max Racks after the expiration date (but before the end of the six-month window). Although the agreement allowed Core Health to sell those units if they were in production as of the expiration date, the jury could have found that Core Health started making

them only after the agreement's termination. Core Health presented no records identifying the dates that its manufacturer started producing the units sold after the agreement expired. And Max Rack presented plenty of circumstantial evidence that the units were placed in production too late. Among other things, emails from over a month after the expiration suggested that Core Health's manufacturer needed "MaxRack removed from placard ASAP so no more are produce[d]." Email, R.94-12, PageID 1754. In February 2016, moreover, Core Health was still trying to ensure that the "next production runs" would be of Freedom Racks. Emails, R.95-5, PageID 1833–1834. And Core Health did not authorize its manufacturer to "scrap" the Max Rack labels for a few more months. Emails, R.95-4, PageID 1831. Yet any sales of later-produced Max Racks would have violated the agreement and so likewise infringed Max Rack's trademark. *See U.S. Structures*, 130 F.3d at 1190.

Lastly, Max Rack cites the testimony of Core Health's finance director regarding 9 more units sold after the agreement expired. The director testified that those units "were purchased as Max Rack[s]" but that Core Health changed the logos to "Freedom Rack" before shipping the units to customers. Winegardner Tr., R.100, PageID 2461. As Max Rack notes, if those customers were sold a "Max Rack," they surely would have been confused when opening the box and finding a "Freedom Rack" inside. Core Health responds that Max Rack misconstrued this testimony. According to Core Health, the finance director suggested that Core Health bought the units as "Max Racks" from the manufacturer and rebranded them as "Freedom Racks" before selling them. To support this claim, however, Core Health points to only more opaque testimony: the director later testified that the units "were purchased as Max Rack and sold as Freedom Rack." *Id.*, PageID 2564. Purchased by whom? His testimony shows the perils of the passive voice. Because Core Health failed to clear up the factual ambiguity at trial, the jury could have treated these sales as infringing. All told, then, the jury reasonably could have found that Core Health infringed the Max Rack mark by selling up to 271 Max Racks without authorization.

*Theory Two: Use of "Max Rack" Name to Sell Freedom Racks*. The district court did not rely on this evidence of continuing Max Rack sales. It instead held that the jury could have found that Core Health, when selling Freedom Racks, continued to use the name "Max Rack" so

as to lead consumers to believe that the machines were affiliated with the Max Rack brand. Yet the court cited three pieces of relatively insubstantial evidence for this conclusion: OC Fitness, a third-party reseller, used the Max Rack mark when selling Freedom Racks on its website; Kirt Moritz conducted a Google search for "Max Rack" and got a "hit" to an unidentified page on Core Health's website; and a stray "Max Rack" reference remained in the Freedom Rack owner's manual. *See Max Rack*, 2020 WL 2128614, at *2–3.

Did this evidence suffice? The district court committed legal error by relying on the first piece: that a downstream reseller (OC Fitness) used the Max Rack mark when advertising Freedom Racks. Max Rack does not identify any basis for imputing this separate entity's conduct to Core Health. We can think of one possibility: the Supreme Court has held that a trademark owner can hold a competing manufacturer liable for "contributory infringement" if the competitor intentionally convinces a third-party distributor to infringe the owner's mark or if the competitor continues to sell to the distributor after learning of the infringing conduct. *See Inwood Lab'ys., Inc. v. Ives Lab'ys., Inc.*, 456 U.S. 844, 853–54, 854 n.13 (1982); 4 McCarthy, *supra*, § 25:18. Here, however, Core Health warned its regular resellers of the pending name change. And Max Rack points to no evidence that Core Health knew of OC Fitness's use of the Max Rack mark. So Max Rack does not even present a contributory-infringement theory on appeal, and the district court erred by relying on OC Fitness's alleged misconduct to hold Core Health liable.

That said, although we find the question close, we agree that Core Health's own continued uses of the Max Rack mark could have created this likelihood of confusion when considered collectively. At the outset, keep in mind a critical distinction in the Lanham Act between proving a violation and proving a proper remedy. *See Web Printing Controls Co., v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204–05 (7th Cir. 1990). To prove a violation, Max Rack needed to show only that Core Health's use of the Max Rack name would *likely* confuse consumers over whether the Freedom Rack was affiliated with the owner of the Max Rack mark in some way. Max Rack did not need to show actual confusion or past injury. *See id.*; *see also Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 689 (6th Cir. 2000). We should

not conflate the minimum showing required to prove a violation with the more rigorous showing required to obtain damages. *See* 4 McCarthy, *supra*, § 23:12.

In addition, there is no dispute that Core Health did continue to use the Max Rack name, even if accidentally, in association with its Freedom Rack sales. As one example, the employee who oversaw the change to the Freedom Rack in Core Health's marketing materials conceded that some parts of the website mistakenly referred to the Max Rack up through the time of her deposition. O'Brien Tr., R.101, PageID 2572–73. As another example, Core Health's former vice president of marketing suggested that the company's ads of the Freedom Rack on its website used an outdated photo of a Max Rack with a partially concealed "Max Rack" logo on a black bar:



Website, R.93-7, PageID 1542; Dilts Tr., R.101, PageID 2496. Kirt Moritz at Max Rack similarly testified that his 2016 search for "Max Rack" on Google returned a "hit" to Core Health's Star Trac website referencing "Max Rack" in a snippet under the web address:

Plate Loaded | Star Trac
www.startrac.com/products-strength-training-plate-loaded | ▼ | Unisen Inc. ▼
With industry standards as well as innovative, patented machines such as our 7 degree
angled Smith Machine and **Max Rack**® this line will strengthen any club.

Ex. 112, R.94-2, PageID 1584.  Core Health's former vice president of marketing suggested that this link directed viewers to a sales page.  Lastly, at the time of trial, Moritz identified an extraneous "Max Rack" reference still in the Freedom Rack owner's manual on Core Health's website.  Manual, R.95-1, PageID 1813.

Core Health rightly responds that these examples show minor uses of the Max Rack mark and perhaps prove only that it implemented the change carelessly.  But this response—that Core Health's uses of the Max Rack mark were harmless—goes more to whether Max Rack established damages than to whether it established a violation.  *See Web Printing*, 906 F.2d at 1204.  Core Health needed to ensure that its materials did not perpetuate the "perception that" its Freedom Racks were affiliated with the Max Rack brand.  *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985) (citation omitted).  These references could create that perception—whether we consider the question under our likelihood-of-confusion factors (for similar marks) or our categorical rule (for holdover licensees).  The goods were the same, the companies were potential competitors, and the mark (Max Rack) was identical.  And Core Health (a former licensee) continued to use the Max Rack mark after the expiration of the licensing agreement.  Indeed, if we accepted Core Health's argument that these uses of "Max Rack" did not violate the Lanham Act because they were trivial, Core Health could continue with them *indefinitely*.  Max Rack would remain powerless to stop Core Health from, say, using the picture of a Max Rack to sell its Freedom Racks.

Important, too, is Core Health's failure to identify a procompetitive justification for its "Max Rack" references.  Such a justification often exists when a competitor uses another's mark to give consumers truthful information about competing goods.  That information allows consumers to identify their preferred product with lower search costs. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995); 4 McCarthy, *supra*, §§ 23:11, 25:52; William McGeveran & Mark P. McKenna, *Confusion Isn't Everything*, 89 Notre Dame L. Rev. 253, 284 (2013).  Suppose, for example, that a new entrant decides to reproduce a well-known type of mineral water.  The new entrant may truthfully tell consumers that it sells water similar to the well-known brand at a lower price.  *See Saxlehner v. Wagner*, 216 U.S. 375, 379–81 (1910); *cf. Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1565 (Fed. Cir. 1994).  As Justice Holmes

explained, the new entrant is "not trying to get the good will of the name, but the good will of the goods." *Saxlehner*, 216 U.S. at 380–81.  This type of "fair use" of a mark seeks to enlighten rather than confuse.  *See* 4 McCarthy, *supra*, § 25:52.  And we should not apply trademark law in a way that effectively gives owners of established products monopoly power over those products (something within patent law's domain).  *See Saxlehner*, 216 U.S. at 380.

In this case, then, Max Rack could not rely on trademark law to prevent Core Health from truthfully telling consumers that the Freedom Rack is identical to the Max Rack or that Core Health used to make the Max Rack for Max Rack, Inc.  Yet Core Health did not assert at trial that its challenged uses of the Max Rack mark served any information-supplying purpose.  That is for good reason.  A consumer who saw the references would come away thinking that the Freedom Rack's producer was affiliated with the Max Rack's owner, not that they were potentially competing against each other.  Core Health instead asserted that the references were "accidents."  Whether innocent or not, however, the references still could have created a likelihood of confusion.  *Cf. Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 589 (7th Cir. 1989).

### Question 2:  Is Core Health entitled to a new trial?

Even if Core Health cannot obtain judgment as a matter of law under Rule 50, it next argues that the district court at least should have granted it a new trial under Rule 59.  But the district court properly exercised its discretion by denying Core Health's new-trial request.

A district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  We have interpreted this rule to permit a new trial on many grounds.  *See Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018); *see also* 11 Charles Alan Wright et al., *Federal Practice & Procedure* § 2805, at 68–73 (3d ed. 2012).  The jury's verdict might conflict with the weight of the evidence presented at trial.  *Compare Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 534–38 (6th Cir. 2014), *with Strickland v. Owens Corning*, 142 F.3d 353, 357–58 (6th Cir. 1998).  Or improper arguments might have caused the verdict to rest more on prejudice against the losing party than on the merits of the winning party's case.  *Compare Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 835–36 (6th Cir. 2013), *with City of*

*Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 755–60 (6th Cir. 1980). The excessive nature of a monetary award might also justify a new trial (or at least a remittitur) if it shows that the verdict arose out of passion or mistake. *Compare Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 397–400 (6th Cir. 1993), *with Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395–96 (6th Cir. 1990).

Core Health relied on several of these grounds here. It claimed that the weight of the evidence did not support the verdict, and that the verdict instead resulted from Max Rack's efforts to bias the jury against Core Health with irrelevant evidence. To support this bias claim, Core Health relied on references at trial to the "addendum" to the licensing agreement that Max Rack entered into with Star Trac in 2010. Under this addendum, Max Rack allowed Star Trac to make belated royalty payments in exchange for a right to a perpetual royalty. When Core Health took over Star Trac's contracts, it decided that a court would not enforce the requirement to pay royalties forever because of caselaw that barred patent holders from seeking royalties after their patent's expiration. *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 449 (2015). Max Rack does not dispute Core Health's understanding of the law. In fact, Max Rack did not even assert a breach-of-contract claim based on Core Health's decision to violate the addendum and stop paying royalties.

According to Core Health, however, Max Rack's witnesses repeatedly inflamed the jury with claims that Core Health unfairly broke its promise in the addendum. Steve Skilken's testimony offers a good example. When counsel asked him if he considered the licensing agreement to have been "successful," he volunteered: "There's an addendum that supersedes this." Skilken Tr., R.99, PageID 2220. He proceeded to describe the addendum's origins. When Star Trac "ran out of money," Skilken explained, Max Rack could have licensed its machine to other parties. *Id.*, PageID 2221. But Skilken would "hate to do that to anybody," so he kindly deferred Star Trac's payments in exchange for the perpetual royalty. *Id.* When the patent neared its expiration six years later, Skilken complained, Core Health refused even to have a "discussion" about abiding by its end of the bargain. *Id.*, PageID 2234–36. His testimony was littered with similar remarks. *See, e.g.*, *id.*, PageID 2249–50.

Max Rack also invoked the addendum during the cross-examination of Core Health's general counsel. The general counsel admitted that he had concluded that a court would not enforce the addendum when he first reviewed it in 2010. Brown Tr., R.101, PageID 2592–93. Max Rack's counsel then characterized the general counsel's failure to inform Max Rack of this view as "fraudulent." *Id.*, PageID 2593, 2602.

To top it off, Core Health identifies objective factors indicating that this largely irrelevant testimony had its intended effect. During deliberations, the jury submitted questions about the addendum: "Is [the addendum] a lawful agreement to take into account given that there was no lawyer present?" and "Is there any law that prevents royalties to be collected on an expired patent, federal or state law?" Tr., R.102, PageID 2687. Core Health also notes that, as the district court found, Max Rack's $1 million damages award had no basis in the evidence.

For several reasons, though, the district court did not commit reversible error in denying Core Health's new-trial motion. Those reasons begin with our standard of review. We review the court's decision under a deferential abuse-of-discretion standard. *See Mosby-Meachem*, 883 F.3d at 602; *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 367–68 (6th Cir. 2005). Absent a legal error, this standard generally bars us from overturning a court's discretionary denial of a new-trial motion unless the record leaves us with a "definite and firm conviction" that the court "committed a clear error of judgment[.]" *Holmes v. City of Massillon*, 78 F.3d 1041, 1045 (6th Cir. 1996) (citation omitted); *see also CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584 (6th Cir. 2015). We owe special deference to the district court for claims (like Core Health's) that improper arguments tainted the jury's decisionmaking. *See CFE Racing*, 793 F.3d at 590. Unlike us, that court had the ability to evaluate the allegedly improper conduct (and its prejudicial impact) by witnessing the conduct firsthand, not by reviewing a transcript of it secondhand. *See Balsley v. LFP, Inc.*, 691 F.3d 747, 762 (6th Cir. 2012) (citing *Peter Kiewit Sons'*, 624 F.2d at 756).

We have no definite and firm conviction of an error. As an initial matter, our caselaw recognizes that a district court's instructions can fix potential harm caused by prejudicial arguments or evidence. *See Holmes*, 78 F.3d at 1046–47; *see also, e.g.*, *CFE Racing*, 793 F.3d at 589; *Troyer v. T.John.E. Prods., Inc.*, 526 F. App'x 522, 525–26 (6th Cir. 2013). The court's

instructions in this case served that purpose. Its responses to the questions that the jury posed during deliberations explained that the jurors need not consider the addendum's legality and that Core Health had correctly interpreted the law. The court indicated that "[t]he lawfulness of [the addendum] is not relevant to the decision that you have to make" and that "there is state and federal law that prohibits any agreement to extend royalties to a patent past the patent expiration." Tr., R.102, PageID 2693–94. At one point in Skilken's testimony about the addendum, moreover, the court instructed the jury to disregard his statements. *See* Skilken Tr., R.99, PageID 2227–28. We presume that the jury followed these instructions when reaching its verdict. *See Troyer*, 526 F. App'x at 525.

In addition, the jury's liability finding (that Core Health engaged in conduct that created a likelihood of confusion) does not conflict with the weight of the evidence. Although Rule 59's weight-of-the-evidence standard differs from Rule 50's sufficiency-of-the-evidence standard, we reach this result based on the same evidence and reasoning on which we relied when affirming the denial of judgment as a matter of law. *See, e.g.*, *Mosby-Meachem*, 883 F.3d at 606–07; *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991). Furthermore, since our court treats the ultimate likelihood-of-confusion question as a legal one that we review de novo, *see Homeowners Grp.*, 931 F.2d at 1107, a new trial on that question would make even less sense. That is especially so because Core Health does not dispute that at least *some* of its actions (the sale of 24 Max Racks outside the six-month window) amounted to infringement. *See U.S. Structures*, 130 F.3d at 1190. It instead challenges the scope of its liability and the size of the awards. Yet why should these claims entail a *complete* redo?

Lastly, the jury's $1 million damages award provides no basis for a new trial either. To be sure, the district court agreed that the evidence did not support this award when overturning it. *See Max Rack*, 2020 WL 2128614, at *4–5. And a court may find an entirely new trial proper if prejudicial arguments on one issue so inflamed the jury as to have "spillover" effects on other issues. *Peter Kiewit Sons'*, 624 F.2d at 759; *see Dossett v. First State Bank*, 399 F.3d 940, 946–47 (8th Cir. 2005). But the district court could reasonably conclude that the award did not prove these spillover effects. The award could have been based just as much on a legal mistake as on undue prejudice. As Core Health notes, Max Rack's witnesses testified that Max Rack spent $1

million bringing the product to market, and Max Rack's counsel referred to those efforts in closing argument. Max Rack does not now claim to be entitled to recover for the efforts. Yet this mistake would not prove a vindictive verdict, and courts have routinely granted new trials solely on damages (or remittiturs) for similar mistakes. *See* 11 Wright et al., *supra*, § 2814, at 198, § 2815, at 208; *see, e.g.*, *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 425 (6th Cir. 1999). The district court did not abuse its discretion by holding that its decision to vacate the award sufficed to correct the error.

**Question 3:  Did the district court commit error by failing to vacate the jury's profits award?**

Unable to rebut the jury's liability findings, Core Health turns to challenging its monetary remedies. Core Health initially argues that the district court wrongly refused to overturn the jury's $250,000 award to Max Rack for Core Health's profits. But this sum had a reasonable basis in the evidence when read against the Lanham Act's burden-shifting approach to proving profits.

If a defendant infringes a trademark in violation of §§ 1114(1)(a) or 1125(a)(1)(A), the Lanham Act offers several remedies. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494–95 (2020). (The parties do not suggest that Ohio law follows different rules for any of the remedial issues that they raise, so we need not consider that law separately.) The Act indicates that "the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). When deciding whether a plaintiff can recover a "defendant's profits," courts have looked to the "principles of equity" because an accounting of profits has traditionally been viewed as an equitable remedy. 5 McCarthy, *supra*, § 30:61. Courts have identified several equitable factors to help guide the inquiry, including whether the defendant acted willfully and whether other remedies would suffice. *See Romag*, 140 S. Ct. at 1497; *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 223 (3d Cir. 2021); *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002).

Here, however, Core Health does not challenge the district court's abstract conclusion that equity allowed for a profits award. It instead challenges the court's conclusion that the

evidence sufficed to show that it earned any money through infringing conduct. The Act adopts a burden-shifting approach to proving a defendant's profits: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). This text placed a modest burden on Max Rack to prove Core Health's "sales." It then flipped the burden to Core Health to identify any deductions from this number for such things as production costs. *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 606 (6th Cir. 1991); 5 McCarthy, *supra*, § 30:65; *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942).

Core Health argues that Max Rack did not meet its initial burden to prove Core Health's "sales." At the outset, though, the parties debate the standard of review. Core Health all but asks us to grant it judgment as a matter of law under Rule 50, suggesting that we should apply a sufficiency-of-the-evidence test and review the district court's denial of relief de novo. *See Mosby-Meachem*, 883 F.3d at 602. Max Rack responds that we should review the district court's denial of relief for an abuse of discretion because Core Health's post-trial motion referred to the profits award only when seeking a new trial under Rule 59. *See id.* To make matters more complex, it is not clear that the jury should have had the final say on this equitable remedy because several cases have noted that parties lack a right to a jury trial for an accounting of profits. *See Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1248 (6th Cir. 1991); 6 McCarthy, *supra*, § 32:124. And when a trademark owner seeks both legal and equitable relief, some courts have tasked the jury with making only an "advisory" profits finding. *Cf. Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711, 722 & n.5 (4th Cir. 2021); Fed. R. Civ. P. 39(c). This fact, too, could affect our standard of review. *See Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 79 n.10 (1st Cir. 2008).

Rather than resolve any standard-of-review questions, we will simply accept Core Health's framing that we should review the district court's refusal to overturn the profits award de novo using a sufficiency-of-the-evidence test. Even under that test, enough evidence justified the award.

Turning to the merits, Core Health argues that the district court wrongly held that the stray references to "Max Rack" on its website could have tainted its Freedom Rack sales. *See*

*Max Rack*, 2020 WL 2128614, at *5. Core Health has a point. What does the Act mean when it provides that a plaintiff must prove a "defendant's sales"? 15 U.S.C. § 1117(a). Which sales? Core Health, for example, makes many weightlifting machines. It would seem dubious to claim that Max Rack could satisfy its initial burden merely by introducing Core Health's total companywide sales data and thereby shift to Core Health the burden to disprove that its infringement affected every dollar of revenue. As Judge Posner explained, a plaintiff likely cannot place an infringer's "corporate income tax return in the record and rest [its] case for an award of infringer's profits." *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983). Instead, a plaintiff likely must show some connection between the identified "sales" and the alleged infringement. For example, in the related copyright context (which uses a similar burden-shifting approach), we have held that a plaintiff's proposed "gross revenue number" (i.e., the defendant's sales figure) "must have a reasonable relationship to the infringing activity." *Balsley*, 691 F.3d at 768–69.

We need not decide, however, whether the stray references to "Max Rack" on Core Health's website tainted all Freedom Rack sales and allowed Max Rack to seek Core Health's profits for the sales. Core Health does not dispute that the sale of any unit "bearing the infringing mark" would have a sufficient connection between the infringement and the sale. *Wynn*, 943 F.2d at 606 (quoting *Mishawaka*, 316 U.S. at 206). And Core Health ignores that the profits award could have been tied to Max Rack's alternative infringement theory: that Core Health sold over 200 *Max Racks* without authorization. If the jury accepted this theory, an obvious connection existed between sales and infringement. Core Health's own figures suggested that it earned $486,088 in revenue and $188,787 in profits on the 218 Max Racks sold in 2016. Spreadsheet, R.94-16, PageID 1767. Max Rack also poked holes in the validity of Core Health's cost figures, suggesting that its inflated numbers hid its true profits. The jury's $250,000 profits award thus could have rested on a distinct infringement theory that Core Health overlooks. That fact suffices to reject Core Health's challenge to the award.

*Question 4: Did the district court properly double the jury's profits award?*

Even if we reject its challenge to the profits award, Core Health next contends, the district court still erred by doubling that award to $500,000. This time, we agree. We review the

court's enhancement under the deferential abuse-of-discretion standard. *Cf. La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 342 (6th Cir. 2010); *Kars 4 Kids*, 8 F.4th at 223–24. But the court abused its discretion because its justification for this enhancement rested on a misunderstanding of the governing burden-shifting law. *Cf. Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1114–15 (9th Cir. 2012).

Recognizing that a fact finder might sometimes have trouble identifying the precise amount of profits generated by a defendant's infringement, Congress gave district courts the discretionary power to adjust a profits award up or down. The Lanham Act provides: "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). Yet the Act imposes a clear limit on this discretionary power: "Such sum . . . shall constitute compensation and not a penalty." *Id.*

This language distinguishes between two types of adjustments. *See La Quinta*, 603 F.3d at 342–43; 5 McCarthy, *supra*, § 30:91; *see also, e.g.*, *Kars 4 Kids*, 8 F.4th at 224–25; *Ga.-Pac. Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 717–19 (4th Cir. 2015); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 109–13 (2d Cir. 1988). On the one hand, the court may increase a profits award for a compensatory reason, such as a concern that the award does not encompass the defendant's full profits. *See La Quinta*, 603 F.3d at 343. Perhaps the defendant received intangible benefits as a result of its infringing conduct. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262–63 (2d Cir. 2014). Or perhaps the defendant engaged in discovery "stonewalling" that prevented the plaintiff from identifying its total infringing sales. *Cf. Bos. Pro. Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 77 (5th Cir. 1979).

On the other hand, the court may not increase a jury's profits award for a punitive reason. The record might show such an improper purpose, for example, if the court highlighted the defendant's bad faith as the basis for the increase. *Cf. Skydive Ariz.*, 673 F.3d at 1115; *Jurgens v. McKasy*, 927 F.2d 1552, 1564 (Fed. Cir. 1991). Or such an improper purpose might exist if the court increased the profits to penalize the defendant for discovery violations, something that

other laws and court rules are better equipped to handle. *Cf. Bos. Pro. Hockey Ass'n*, 597 F.2d at 77.

In this case, the district court got off to the right start by noting that the Act bars a punitive enhancement and by basing its increase on Core Health's evasive discovery conduct. *See Max Rack*, 2020 WL 2128614, at *6–7. Max Rack had asked Core Health to provide all documents that would show the costs that Core Health incurred in making the machines. But Core Health allegedly failed to provide sufficient cost data, which led Max Rack to move to exclude any nondisclosed evidence from trial as a sanction. The court granted this motion in limine. After the trial, the court then relied on Core Health's failure to disclose its cost data a second time by using it to enhance Max Rack's profits award. *Id.* It reasoned that Core Health's cost-related discovery failures "could have undoubtedly hindered [Max Rack's] ability to calculate accurately [Core Health's] infringing profits." *Id.* at *7.

This logic got things backward under the Lanham Act. Given the Act's burden-shifting approach, the district court's first order granting Max Rack's motion in limine increased the chances of *over*compensation (not *under*compensation) to Max Rack. The Act required Max Rack "to prove [Core Health's] sales only[.]" 15 U.S.C. § 1117(a). Max Rack had no difficulty doing so. It established this sales figure with a report from Core Health's finance director summarizing Core Health's revenue from its sales. During closing argument, Max Rack conceded that it was "willing to accept [Core Health's] numbers for revenue." Tr., R.102, PageID 2627. It did not suggest that Core Health had hidden sales.

At this point, the Act flipped the burden to Core Health to prove "all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). What would happen if Core Health did nothing to prove its costs? Core Health's total sales (the amount that Max Rack agreed on) would become the "profits" that Max Rack could recover. *Id.* But this sales figure would greatly exceed Core Health's real-world profits (revenue minus expenses) because it would not account for its real-world expenses. The district court's order on the motion in limine thus made it more likely that the jury would treat an inflated sales figure as Core Health's profits, because the order hindered Core Health's ability to prove its costs. As other courts have recognized when discussing this type of discovery sanction, the order punished Core Health by barring it from introducing

relevant evidence to reduce its liability. *Cf. Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 70, 72 (2d Cir. 1988); *Blackman v. Hustler Mag., Inc.*, 800 F.2d 1160, 1163–64 (D.C. Cir. 1986).

Under this legal regime, we can see no compensation-based rationale in the district court's decision to rely on Core Health's discovery conduct a second time by using it to increase Max Rack's profits award. Core Health's conduct did not make it more difficult for Max Rack to satisfy its burden to prove Core Health's sales. Given the first discovery sanction, Core Health's conduct instead made it more difficult for Core Health to prove its own costs—and so more likely that the jury would treat Core Health's sales figure as its "profits" figure. Max Rack, moreover, cannot now complain that more cost evidence from Core Health would have revealed a lower cost figure (so a higher profits figure) because Max Rack *itself* moved to exclude any further cost evidence. The award was likely already inflated, so the decision to double it cannot be described as remedial. That decision effectively amounted to a second sanction for Core Health's failure to produce its cost evidence. But such a "penalty" runs afoul of § 1117(a). *See Skydive Ariz.*, 673 F.3d at 1115.

That the missing discovery concerned Core Health's costs also distinguishes the lone Fifth Circuit case on which the district court relied. *See Bos. Pro. Hockey Ass'n*, 597 F.2d at 77. In that case (which overturned an enhanced award), the court discussed a hypothetical defendant that refused to turn over *sales* data. *See id.* Such stonewalling very well could prevent a plaintiff from proving the defendant's total sales (and thus allow the defendant to hide its profits). But Max Rack had no problem identifying Core Health's sales, and any stonewalling on costs would have harmed Core Health. So the district court abused its discretion by granting enhanced profits when its first sanction sufficed to remedy Core Health's discovery shortcomings.

**Question 5: Did the district court mistakenly vacate the jury's $1 million damages award?**

Max Rack argues that the district court erred in the other direction—by overturning the jury's $1 million damages award. Although we review the court's decision de novo, *Balance Dynamics*, 204 F.3d at 688, we agree that Max Rack failed to establish any recoverable damages.

Apart from a "defendant's profits," the Lanham Act permits recovery of "any damages sustained by the plaintiff" from the infringement. 15 U.S.C. § 1117(a). That is, a plaintiff may

seek "pecuniary compensation" for the "loss, detriment, or injury" caused by the defendant's infringing use of the plaintiff's mark (or a deceptively similar one). *Black's Law Dictionary* 466 (4th ed. 1951); *Webster's New International Dictionary* 664 (2d ed. 1934). To obtain damages, then, the plaintiff must do more than prove the "likelihood of confusion" that suffices to establish a defendant's liability (and authorize an injunction). *See Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006). Such a likelihood may (or may not) generate the type of "injury" that the plaintiff must prove to receive this type of monetary relief. *See id.*; 5 McCarthy, *supra*, §§ 30:2.50, 30:74.

What kinds of injuries may a plaintiff recover for? Because the Lanham Act uses a common-law term ("damages"), we have looked to the common law of torts to help answer this question. *See La Quinta*, 603 F.3d at 342; *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991). Compensatory damages at common law generally sought to place plaintiffs in the "substantially equivalent" position that they would have been in if no tort had occurred. Restatement (Second) of Torts § 903 cmt. a (Am. L. Inst. 1979). A recoverable "loss" thus can take a variety of forms. A trademark owner might seek to recover profits that it has lost because a competitor used an infringing mark to poach sales to customers. *See Balance Dynamics*, 204 F.3d at 690–91; 5 McCarthy, *supra*, § 30:79. If a holdover licensee continues to use a mark, the trademark owner might also seek the royalties that it would have earned on the licensee's illicit sales under the licensing agreement. *See La Quinta*, 603 F.3d at 341 & n.10; 5 McCarthy, *supra*, § 30:86. Apart from these "lost profits," a trademark owner might further seek to recover for the "lost goodwill" that arose when consumers bought the infringer's inferior product and soured on the owner's brand as a result. *Balance Dynamics*, 204 F.3d at 690–91. Or a trademark owner might seek to recover the "damage control costs" that it incurred to reduce the harm from the infringer's conduct—say, by spending money on advertisements clarifying that the owner has no affiliation with the infringer. *See id.* at 691–92.

To recover for these different losses, a plaintiff might need to prove different things. Before awarding "marketplace" damages like lost profits, for example, courts generally require a plaintiff to show that an infringing mark has *actually* confused some consumers about the mark's affiliation with the plaintiff's good (not just that it is *likely* to do so). *See id.* at 691; 5 McCarthy,

*supra*, § 30:74 (citing cases). Because juries might have trouble quantifying these losses, this actual-confusion evidence helps ensure that they at least exist. *See Balance Dynamics*, 204 F.3d at 691. But other losses do not require this showing. Damage-control costs, for example, seek to ensure that actual confusion does *not* arise. So it would make little sense to require proof of actual confusion to recover these costs. *See id.* Nor have we referred to an actual-confusion element when requiring a holdover licensee to pay the royalty (an objective measure) on infringing sales. *See La Quinta*, 603 F.3d at 341–45. Lastly, if a plaintiff has obtained an award of the defendant's profits (which is a proxy for what the plaintiff would have earned on the sales), the plaintiff must tie separate damages to a distinct harm and cannot seek a double recovery. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994); 5 McCarthy, *supra*, § 30:73; *cf. La Quinta*, 603 F.3d at 345.

These rules show that Max Rack failed to present enough evidence to recover damages under either of its infringement theories. Under Max Rack's first theory, Core Health sold some 271 Max Racks without authorization. Admittedly, the jury could have found that Max Rack suffered marketplace losses—for example, the royalty that it would have earned—if it believed that Core Health violated the agreement by selling those units. Before trial, however, Core Health paid Max Rack the profits Core Health earned on 24 of the units and its standard royalty for 238 more (all with interest). Max Rack does not claim that this payment failed to adequately remedy any marketplace injury. That leaves only the 9 machines that the jury could have found were sold to consumers as "Max Racks" but shipped as "Freedom Racks." Although Core Health did not pay Max Rack for these sales, Max Rack's profits award would have remedied any harm from them. A further award would have amounted to a double recovery. *See Nintendo*, 40 F.3d at 1010.

Max Rack's damages claim fares no better when we turn to its second infringement theory: that Core Health sold an unknown number of Freedom Racks by keeping "Max Rack" references on its website. Max Rack all but concedes that it lacks evidence of actual consumer confusion from Core Health's minor uses of the Max Rack name, which our cases suggest it needed to show. *See Balance Dynamics*, 204 F.3d at 691. Besides, Max Rack also fails to point us to any other evidence that these stray uses of its name caused it harm. Max Rack had not even

created a new "Max Rack" product by the time of trial, so it lost no sales from Core Health's uses. Max Rack would have made no sales regardless of Core Health's conduct. The Freedom Rack was also identical to the Max Rack and made by the same manufacturer. So Max Rack identifies no "goodwill" injury that could have resulted from an inferior product's use of its name. *Contra Broan Mfg.*, 923 F.2d at 1238–39.

Max Rack counters that the district court overturned its award *solely* on the ground that the company failed to prove actual confusion. *Max Rack*, 2020 WL 2128614, at *4–5. It argues that we should do away with any categorical actual-confusion requirement for proving marketplace damages because the Supreme Court in *Romag* recently did away with a similar categorical rule. *See* 140 S. Ct. at 1494–97. In the past, we had suggested that a plaintiff must prove that a defendant willfully infringed the plaintiff's mark to obtain the defendant's profits under § 1117(a). *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville*, 849 F.2d 1012, 1015–16 (6th Cir. 1988). *Romag* rejected this categorical requirement as inconsistent with § 1117(a)'s text. 140 S. Ct. at 1494–95. The Court instead treated a defendant's intent as only a "highly important" factor for a profits award. *Id.* at 1497. Max Rack asks us to treat actual confusion in the same way because § 1117(a) does not list actual confusion in the text either. But we need not decide how *Romag* affects the traditional actual-confusion prerequisite for marketplace damages. Even if we treated actual confusion as an "important" factor, *id.*, Max Rack identifies nothing to show that Core Health's stray references to "Max Rack" caused it harm. No matter the governing legal standard, Max Rack's speculation of harm would not suffice to justify a damages award. *See La Quinta*, 603 F.3d at 342.

Max Rack notes, however, that even our existing caselaw did not require it to prove actual confusion for some damages, such as the damage-control costs that we have mentioned. *Balance Dynamics*, 204 F.3d at 689–91. But Max Rack makes no claim that it spent even a dollar seeking to mitigate the damages caused by Core Health's conduct. And Max Rack does not claim that it suffered any other type of loss for which actual consumer confusion is irrelevant.

Max Rack thus turns to out-of-circuit precedent. It argues that some courts have presumed actual confusion (and shifted the burden to a defendant to disprove it) when the

defendant has intentionally deceived the public by using a deceptive mark or comparative false advertising. *See Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir. 1997); *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991). Highlighting the jury's intentional-infringement finding in this case, Max Rack claims that the presumption of actual confusion should apply here. But the jury's intent finding rests most reasonably on Core Health's continued sales of Max Racks in violation of the licensing agreement, and Max Rack already received full compensation for those sales. No reasonable jury, by contrast, could have found that Core Health's few extraneous references to the Max Rack mark in its Freedom Rack advertisements were intentional (rather than accidental). *See Res. Devs.*, 926 F.2d at 140–41. So we need not consider how this intent element should affect damage awards.

Max Rack ends with a procedural claim. It criticizes the district court for granting Core Health judgment as a matter of law on the damages award because Core Health had only sought a new trial under Rule 59. True, a court that finds a verdict excessive under Rule 59 generally must give the plaintiff a choice between a remittitur and a new trial. *See Farber*, 917 F.2d at 1395–96; 11 Wright et al., *supra*, § 2815, at 208–10. Max Rack did not receive that choice: the court effectively granted a remittitur (down to zero) without a new-trial option. But courts have also held that they may reduce or eliminate a monetary award without permitting a new trial when the award rests on a legal error (not on the discretionary ground that the verdict was excessive). *See Roush*, 10 F.3d at 400; *Westchester Fire Ins. Co. v. Hanley*, 284 F.2d 409, 418 (6th Cir. 1960); *Niagara Fire Ins. Co. v. Bryan & Hewgley, Inc.*, 195 F.2d 154, 157 (6th Cir. 1952); *see also Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1091–92 (7th Cir. 2019); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330–31 (11th Cir. 1999). Here, the district court found a legal error—that no evidence undergirded Max Rack's claimed injury. So it could grant judgment outright.

*Question 6: Did the district court wrongly grant Max Rack an award of attorney's fees?*

That leaves Core Health's challenge to Max Rack's award of some $381,808.32 in attorney's fees. We review this award—like the district court's award of double profits—under a deferential abuse-of-discretion standard. *See Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724,

728 (6th Cir. 2004); *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014). We again conclude that the court abused its discretion.

The Lanham Act gives a district court discretion to compel the losing party to pay the winning party's attorney's fees, but only in certain cases. It provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The use of the word "exceptional" limits the district court's discretion by reserving attorney's fees for "rare" or "unusual" cases. *Webster's*, *supra*, at 889; 5 *Oxford English Dictionary* 498–99 (2d ed. 1989); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553–54 (2014). The Act thus departs from, say, the Copyright Act, which permits fee awards without any exceptional-circumstances limit. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016).

When interpreting a similar limit on attorney's fees in the patent laws, the Supreme Court has explained that a case might qualify as "rare" or "unusual" for different reasons. *See Octane*, 572 U.S. at 554. The plaintiff might have an unusually strong (or unusually weak) case on the merits. *See id.* Blatant trademark infringement might justify an award for the plaintiff, whereas a frivolous infringement claim might justify one for the defendant. *See id.* Or the losing party might have litigated the case in an unreasonable manner—for example, by requesting costly discovery to coerce a settlement despite the weakness of its claims. *See id.* In the end, however, the statute leaves it for the district court to decide under the totality of the circumstances whether the case before it has the "rare" qualities that distinguish it from a typical case. *See id.* Circuit courts have followed this same approach for the Lanham Act's similar language. *See Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 235 (6th Cir. 2019); *see also LHO Chi. River, L.L.C. v. Perillo*, 942 F.3d 384, 388 (7th Cir. 2019) (citing cases); 5 McCarthy, *supra*, § 30:99 n.9 (same).

Judged under this framework, nothing about this case looks unusual. To begin with, Max Rack did not have a noticeably stronger "litigating position." *Octane*, 572 U.S. at 554. That point is made clear by considering its two infringement theories. The evidence for its first theory (that Core Health's post-agreement Max Rack sales violated the agreement) could be described as "thin." *See Visible Sys. Corp.*, 551 F.3d at 82. Except for the limited number of units that

Core Health sold outside the selloff window (and for which it paid compensation before trial), Core Health's liability rested on the claim that Core Health began to make those units after the agreement expired. But that claim was supported only by circumstantial evidence falling close to the hazy border dividing what a jury can (and cannot) reasonably find. *Cf. Evoqua Water Techs.*, 940 F.3d at 235. Core Health's liability on Max Rack's second theory (that Core Health used the Max Rack mark to sell Freedom Racks) could be described as equally "thin." *See Visible Sys. Corp.*, 551 F.3d at 82. This theory rested on isolated and likely accidental references to Max Rack's mark on Core Health's website. As we have said, the collective references barely established the likelihood of confusion that could support an injunction, and Core Health's marketing director voluntarily removed all references she learned of during her deposition. As the district court recognized, moreover, Max Rack suffered no damages from the references, further undermining any entitlement to fees.

Likewise, Core Health did not litigate this case in an "unreasonable manner." *Octane*, 572 U.S. at 554. To be sure, the district court noted that Core Health failed to turn over its costs data. But that shortcoming largely harmed Core Health, not Max Rack, and the district court did not mention the discovery issue when awarding fees. *See Max Rack*, 2020 WL 2128614, at *7. Max Rack also did not have unclean litigating hands. Its witnesses peppered the record with references to the addendum and complaints about Core Health's allegedly unfair refusal to pay royalties in perpetuity. Yet its counsel admitted that "this lawsuit isn't about the addendum." Tr., R.102, PageID 2632. In short, if this case warranted attorney's fees, we fail to see what case would not.

For its part, the district court relied on precedent that it read as creating a bright-line rule permitting fees if a defendant's intentional infringement continued after the plaintiff sued. *See Max Rack*, 2020 WL 2128614, at *7. This rule applied here, the court reasoned, because the jury found Core Health's conduct to be intentional and because Core Health admitted that its infringement continued even through the trial. *See id.* Its reasoning rested on legal error. The district court's rigid rule conflicts with the Supreme Court's more flexible totality-of-the-circumstances approach to this inquiry. *See Octane*, 572 U.S. at 554. Perhaps unsurprisingly, not one of the cases that the court cited for this rule mentioned *Octane*. *See Zeroez Franchising*

*Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1050 (D. Minn. 2015); *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 921 (S.D. Ohio 2014); *Ramada Franchise Sys., Inc. v. Boychuk*, 283 F. Supp. 2d 777, 787, 792–93 (N.D.N.Y. 2003). In addition, although the jury found intentional infringement, that finding reasonably rested on Core Health's unauthorized sales of Max Racks. That conduct ended well before the trial. Lastly, the district court's conclusion partially relied on OC Fitness's alleged infringement of the Max Rack mark. *See Max Rack*, 2020 WL 2128614, at *7 n.4. As we have explained, however, that conduct cannot be held against Core Health at all, let alone provide the grounds for an attorney's fees award.

\* \* \*

In sum, we affirm in part, reverse in part, and remand. We affirm the district court's denial of Core Health's motion for judgment as a matter of law or for a new trial. We also affirm the $250,000 profits award and the court's rejection of the $1 million damages award. But we reverse the court's decision to double the profits award and its decision to grant Max Rack attorney's fees. We thus remand for the court to enter a new judgment consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

COLE, Circuit Judge, concurring in part and dissenting in part. I would affirm the district court in full. Therefore, I respectfully dissent from the majority's treatment of the district court's resolution of the profits award and attorney's fees.

I.

A. Disgorged Profits Award

15 U.S.C. § 1117(a) grants district courts the power, based on principles of equity, to award disgorged profits and to increase or decrease a jury's monetary award. The statute "grants a district court a great deal of discretion in fashioning an appropriate remedy in cases of trademark infringement." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). Here, the district court did not abuse that broad discretion when it increased the jury's profits award.

Enhancement of profits under § 1117(a) is used to "provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010). That's exactly what the district court did here. As a result of Core Health's mismanagement and failures at the discovery stage, the profits calculation made by the jury was imprecise. Specifically, the only evidence that Core Health presented to prove costs was a summary spreadsheet of the "standard cost" of goods with no information about the actual cost of the products. And the only witness that Core Health had testify about the cost spreadsheet could not fill these gaps. The witness had not participated in the calculation of those costs. For these reasons, the district court enhanced the profits award to ensure that Max Rack was justly compensated, despite the imprecision resulting from Core Health's conduct.

Further, Core Health argues on appeal that the district court abused its discretion by doubling the jury's profits award because any doubt about its costs could only *decrease* the award. But it is equally possible that the jury *overestimated* the costs based on the limited summaries Core Health provided. Core Health urged the court to accept its "standard cost" evidence. But Max Rack disputed that evidence, and it would not be an abuse of discretion for the court to accept Max Rack's estimation of costs.

Ultimately, I would affirm the district court's decision to enhance the profits award. Enhancement of profits was necessary to provide proper redress to Max Rack. For much the same reasons, I also do not consider it an abuse of discretion that the district court did not vacate the jury's profits award.

B.  Attorney's Fees

A district court may award attorney's fees in "exceptional cases." 15 U.S.C. § 1117(a). Courts often consider a trademark infringement case exceptional when the infringing actions were intentional, and the infringement continues until the date of trial. *See, e.g.*, *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 921 (S.D. Ohio 2014); *Ramada Franchise Sys., Inc. v. Boychuk*, 283 F. Supp. 2d 777, 787 (N.D.N.Y. 2003); *Zeroez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1050 (D. Minn. 2015).

Here, the jury found that the trademark infringement was intentional. And evidence suggested that this infringement continued for four years, up until the time of trial. Kirt Moritz navigated to the Core Health webpage during the lunch break of the first day of trial. He found that the assembly manual still referenced the Max Rack, over four years after the license expired. And on the second day of trial, even after he had testified about the reference the prior afternoon, the reference to the Max Rack was still on the Core Health website.

Core Health continued to leave lingering references to the Max Rack on its website despite repeated warnings. Core Health should have been on notice of its infringing behavior after Max Rack filed the lawsuit. At the very least, Core Health must have been on notice when its marketing director was informed, during her deposition, that the website still referenced the

Max Rack.  Despite the fact it would have been a simple fix, Core Health refused to remedy the problem for four years.

Because Core Health continued infringing on the Max Rack trademark for years, it was not an abuse of discretion for the district court to award attorney's fees.

## II.

I would affirm the district court's decisions in full and therefore respectfully dissent in part from the majority opinion.