**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 23, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

HETRONIC INTERNATIONAL, INC.,

    Plaintiff – Appellee,

v.

HETRONIC GERMANY GMBH; HYDRONIC-STEUERSYSTEME GMBH; ABI HOLDING GMBH; ABITRON GERMANY GMBH; ABITRON AUSTRIA GMBH; ALBERT FUCHS,

    Defendants – Appellants.

Nos. 20-6057 & 20-6100

_____

**On Remand from the Supreme Court**
**of the United States**
**(S.C. No. 21-1043)**
**(D.C. No. 5:14-CV-00650-F)**
_____

Lucas M. Walker (Anton J. Rupert and Geren T. Steiner, Rupert & Steiner PLLC, Oklahoma City, Oklahoma, on the supplemental briefs), of MoloLamken LLP, Washington, D.C., for Defendants - Appellants.

Debbie L. Berman (Wade A. Thomson, Jenner & Block LLP, Chicago, Illinois, Gianni P. Servodidio, Rémi J.D. Jaffré, Jenner & Block LLP, New York, New York, Matthew S. Hellman, Jenner & Block LLP, Washington, D.C., Samuel R. Fulkerson, Ogletree, Deakins, Nash, Smoak & Stewart P.C., Oklahoma City, Oklahoma, with her on the supplemental brief), of Jenner & Block LLP, Chicago, Illinois, for Plaintiff - Appellee.

_____

Before **PHILLIPS**, **MURPHY**, and **McHUGH**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

This case returns to us on remand from the Supreme Court for further proceedings in accordance with *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023). The underlying dispute involves the alleged infringement by Abitron, a foreign company, of U.S.-registered trademarks owned by Hetronic, an American company. Abitron sold Hetronic-branded products without permission to customers around the world, including in the United States; Hetronic alleged that these sales violated its trademark-ownership rights under the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a)(1).

Deciding this appeal in 2021, we held that Lanham Act penalties extended to Abitron's foreign sales to foreign customers because the foreign sales substantially affected U.S. commerce. *Hetronic Int'l, Inc. v. Hetronic Ger. GmbH*, 10 F.4th 1016, 1046 (10th Cir. 2021), *vacated*, 600 U.S. 412 (2023). Abitron petitioned the Supreme Court for certiorari, asking the Court to decide whether the Lanham Act may indeed apply to "purely foreign sales that never reached the United States or confused U.S. customers." Petition for Writ of Certiorari, *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412 (No. 21-1043). The Supreme Court granted Abitron's petition. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 143 S. Ct. 398 (2022) (mem.). Considering the

2

extraterritoriality of the Lanham Act for the first time since the 1950s,[1] the Court assessed whether the Lanham Act's trademark-infringement provisions apply to Abitron's foreign infringing conduct. *Abitron*, 600 U.S. at 415. The Court held that the provisions are not extraterritorial, but that they remain in force when a foreign entity uses an infringing mark in domestic commerce. *Id.* at 423, 428. The Court then vacated our decision and remanded the case. *Id.* at 428.

We requested and received supplemental briefing from the parties on the impact of this decision and reheard the case for oral argument. Having revisited the Lanham Act issue in light of the Supreme Court's opinion and having considered the parties' supplemental arguments, we issue this revised opinion and remand the case to the district court for further proceedings as prescribed below.

## BACKGROUND

We have previously spelled out the facts and procedural history, *see Hetronic*, 10 F.4th at 1023–27, so we discuss the background briefly, focusing on the facts most relevant to the Lanham Act claims.

Hetronic International, Inc. (Hetronic) manufactures radio remote controls used to operate large industrial equipment. The remotes are

---

[1] *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 281, 285 (1952) (determining the Lanham Act's governance over infringing conduct committed by an American citizen operating a counterfeit wristwatch business in Mexico).

identifiable by the "HETRONIC®" mark, Appellants' App. vol. 3 at 679, product marks specific to Hetronic's remote models, like "NOVA" and "ERGO," *id.*, and by the remotes' trade dress—a "distinctive black-and-yellow color scheme," *Hetronic*, 10 F.4th at 1024.[2] Hetronic executed licensing and distribution agreements for the remotes with two European companies, collectively Abitron.[3]

Sometime during Hetronic's dealings with Abitron, Abitron employees surmised that Abitron owned some of Hetronic's intellectual property (IP) under a years-old research-and-development agreement. Asserting that this IP ownership empowered Abitron to manufacture its own version of Hetronic's products, Abitron began assembling remotes that mimicked Hetronic models. Abitron built these Hetronic-branded remotes with parts that it sourced from unauthorized suppliers, in violation of its agreements with Hetronic. Abitron sold these copycat remotes to foreign and American customers. Hetronic terminated its licensing and distribution agreements with Abitron, but Abitron continued to sell Hetronic-branded remotes without Hetronic's authorization.

---

[2] Collectively, we refer to these marks and trade dress as the "Hetronic trademarks."

[3] Albert Fuchs owned Hydronic Steuersysteme GmbH (an Austrian company) and Hetronic Germany GmbH (a German company), which were later bought by Abitron Germany GmbH and Abitron Austria GmbH through Fuchs's holding company, ABI Holding GmbH. Fuchs and the corporate entities associated with him are the named defendant-appellants in this litigation, to whom we refer collectively as "Abitron."

Radio-remote-control sales is a worldwide business; a product manufactured in Germany is often destined for another country, like the United States. Given the global nature of this business, Abitron typically sold its remotes through middlemen—original equipment manufacturers (OEMs)—rather than directly to end-users. It worked like this: Abitron would sell the remotes to an OEM; the OEM would install the remotes into its own machinery (like cranes); and then the OEM would sell that machinery to end-users (like construction companies) in other countries, including the United States. Knowing that many of its remotes would eventually be exported into the United States through the OEMs, Abitron secured the required Federal Communications Commission (FCC) certifications and hired a U.S.-based distributor to service Abitron's U.S. products and to market them at U.S. tradeshows.

Based on this conduct, Hetronic sued Abitron in Oklahoma federal district court for breach of contract, later adding claims for federal trademark infringement under the Lanham Act, along with several other state-law tort claims.[4] The district court held an eleven-day jury trial, after which the jury

---

[4] Hetronic's second amended complaint alleged breach of contract, federal trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A), federal unfair competition under § 1125(a)(1)(A), "reverse palming off" under § 1125(a)(1)(A), federal trademark counterfeiting and infringement under § 1114, federal contributory trademark infringement (against Fuchs, only), as well as unfair competition,

(*footnote continued*)

5

found for Hetronic on all its claims. The jury found that Abitron had willfully infringed the Hetronic trademarks under the Lanham Act and awarded Hetronic about $96 million in damages related to those violations, along with compensatory and punitive damages for the state-law claims. The district court then ordered a permanent injunction against Abitron, enjoining it from any further infringing uses of Hetronic trademarks "within and outside of the United States." Appellants' App. vol. 10 at 2521.

Abitron appealed the judgment. On appeal, Abitron challenged the worldwide Lanham Act injunction, the disgorgement based on Abitron's foreign sales, some of the district court's evidentiary rulings at trial, the district court's rejection of Abitron's IP-ownership defense at summary judgment, and the court's exercise of personal jurisdiction over the foreign defendants. We affirmed and reversed in part.[5]

Relevant here, we applied Supreme Court and circuit precedent in deciding whether the Lanham Act's trademark-infringement provisions reached Abitron's foreign sales to foreign customers. *See Hetronic*, 10 F.4th at

---

tortious interference with contract, aiding and abetting breach of fiduciary duty, civil conspiracy, and conversion under Oklahoma state law.

[5] We affirmed the proper exercise of personal jurisdiction over all foreign defendants, the Lanham Act's application to Abitron's foreign sales, the district court's summary-judgment ruling denying defendants' IP-ownership defense, and the district court's evidentiary rulings; but we narrowed the scope of the worldwide injunction to "the countries in which Hetronic currently markets or sells its products." *Hetronic*, 10 F.4th at 1047. We reversed and remanded on that basis.

1033–38, 1045 (citing *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 338 (2016) (applying the Court's extraterritoriality framework to the Racketeer Influenced and Corrupt Organizations Act (RICO) Act); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255–65 (2010) (assessing the extraterritorial reach of the Securities Exchange Act); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 281–87 (1952) (deciding whether the Lanham Act covered trademark infringement committed primarily in Mexico, though some facilitating steps were taken in the United States); *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956) (creating a tripartite test to determine the extraterritoriality of the Lanham Act); *Timberlane Lumber Co. v. Bank of Am. Nat'l Tr. & Savs. Ass'n*, 549 F.2d 597, 613 (9th Cir. 1976) (adopting its own extraterritoriality test); *McBee v. Delica Co.*, 417 F.3d 107, 111, 118–21 (1st Cir. 2005) (same)). So as a matter of first impression for this court, we fashioned a test to determine the Lanham Act's extraterritoriality. *Id.* at 1037–38. Our test amalgamated the factors that we found most persuasive among those espoused by our fellow circuit courts, which led us to adopt three factors: (1) whether the defendant is an American citizen, (2) whether the defendant's conduct has substantially affected U.S. commerce, and (3) whether the Act's extraterritorial application would conflict with the defendant's established trademark rights in another country. *Id.* at 1036–38. Because none of the defendant-appellants are American citizens and none argued that any other foreign-trademark rights would conflict with the Lanham Act's

7

application here, the substantial-effect prong remained as the singular touchstone for our analysis.

We evaluated the substantial effect of Abitron's sales on U.S. commerce, as divided into three groups: direct sales to U.S. customers, foreign sales of products that "ended up" in the United States, and foreign sales that diverted customers away from Hetronic. *Id.* at 1042–43. For the first group (direct U.S. sales), we easily concluded that the Lanham Act governed because these sales invoked a purely domestic application of the Act. *Id.* at 1043 ("[T]he Lanham Act would encompass [Abitron's] direct sales into the United States even if we concluded that the Act didn't apply extraterritorially . . . ."). For the second group (products sold abroad that ended up in the United States), we determined that "the effects of [Abitron's] foreign conduct [were] sufficiently substantial," *id.* at 1044, to raise an actionable Lanham Act claim because Hetronic had submitted evidence at trial "that U.S. consumers were confused about Hetronic's product's relationship to the Abitron companies," *id.* at 1043, due to its foreign sales. And for the third group (diverted foreign sales), we observed that "[w]hen diverted sales that would have otherwise flowed to a U.S. company instead inure to a foreign defendant, the loss to U.S. commerce is clear," *id.* at 1045, and we agreed that ample evidence buoyed Hetronic's claim that Abitron's "foreign infringing conduct had a substantial effect on U.S. commerce," *id.* at 1046. *See id.* (upholding the diversion-of-sales theory based on "the millions of euros worth of infringing products that made their way into

8

the United States," the "diverted tens of millions of dollars of foreign sales," and the "numerous incidents of confusion among U.S. consumers"). Altogether, we concluded that evidence "of a sufficient character and magnitude" supported extending Lanham Act protections to Hetronic for Abitron's foreign infringing conduct. *Id.*

But our decision added yet another Lanham Act extraterritoriality framework into the mix, further entrenching the extant circuit split. Soon after, the Supreme Court granted Abitron's petition for certiorari to settle when and how far the Lanham Act extends to protect U.S.-trademark owners from foreign infringement. *Abitron*, 600 U.S. at 417. In doing so, the Court crafted a new framework to determine the extraterritorial application of the relevant Lanham Act provisions. That framework lays the foundation for our discussion.

## DISCUSSION

Our principal task on remand is to reevaluate which of Abitron's allegedly infringing activities count as "uses in commerce" under the Supreme Court's new extraterritoriality framework for the Lanham Act's trademark-infringement provisions. *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1). After engaging with this framework and drawing our conclusions, we then discuss how our revised view of the Lanham Act's application to Abitron's conduct impacts the remedies awarded in the district court.

## I.    *Abitron*'s Extraterritoriality Framework

The Lanham Act regulates and protects the use of federally registered trademarks in U.S. commerce. The statute ordinarily governs domestic trademark disputes, but this case posed a different scenario: What happens when a foreign entity infringes on an American-registered trademark outside the United States? The Supreme Court has contemplated similar extraterritorial applications of U.S. statutes in recent years. *See, e.g.*, *Nestlé USA, Inc. v. Doe*, 593 U.S. 628 (2021) (Alien Tort Statute); *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325 (2016) (RICO Act); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) (Security Exchange Act). But until *Abitron*, the Court had yet to decide when the Lanham Act's trademark-infringement provisions might, if ever, reach an infringer's foreign conduct.

In *Abitron*, the Supreme Court began with a "longstanding principle of American law" called the "presumption against extraterritoriality." 600 U.S. at 417 (cleaned up). Under that presumption, "exclusively 'foreign conduct is generally the domain of foreign law.'" *Id.* (brackets omitted) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007)). But when Congress expresses "a contrary intent," the presumption may be rebutted. *Id.* To decide whether an act of Congress rebuts the presumption, courts apply a "two-step framework." *Id.* (quoting *RJR*, 579 U.S. at 337).

"At step one, we determine whether a provision is extraterritorial," meaning that "Congress has affirmatively and unmistakably instructed that the

provision at issue should apply to foreign conduct." *Id.* at 417–18 (quotation marks omitted) (quoting *RJR*, 579 U.S. at 335). If the statute contains such an instruction, then "claims alleging exclusively foreign conduct may proceed, subject to 'the limits Congress has (or has not) imposed on the statute's foreign application.'" *Id.* at 418 (quoting *RJR*, 579 U.S. at 337–38). But if the provision lacks any express intent for the law to apply outside the United States, then we proceed to step two. *Id.*

At step two, we gauge whether the claim alleges "a (permissible) domestic or (impermissible) foreign application" of the provision. *Id.* Embedded in that question lies another two-part inquiry: first, to "identify the statute's focus," and second, to "ask whether the conduct relevant to that focus occurred in United States territory." *Id.* (cleaned up). This two-pronged inquiry at step two "separate[s] the [domestic] activity that matters from the [foreign] activity that does not." *Id.* at 419. And even among the domestic activity, only "the conduct relevant to the statute's focus" implicates the Lanham Act. *Id.* (citation omitted) ("[T]he presumption would be meaningless if any domestic conduct could defeat it."); *see also WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018) ("If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute . . . . But if the relevant conduct occurred in another country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." (cleaned up)).

11

Applying "this well-established framework," the Supreme Court concluded that the Lanham Act provisions at issue, § 1114(1)(a) and § 1125(a)(1), are not extraterritorial.[6] *Abitron*, 600 U.S. at 419. So the Court proceeded to step two to determine the statute's focus and the conduct relevant to that focus. *See id.* at 421. At this step in the analysis, the Court accused the parties of "miss[ing] th[e] critical point" by disputing the Lanham Act's focus "without regard" to the relevant conduct. *Id.* The Court reasoned that under "*any* potential focus of § 1114(1)(a) and § 1125(a)(1)," the relevant conduct is the infringing, domestic "use in commerce" of a trademark.[7] *Id.* at 423 (emphasis added). "[I]f all the conduct regarding the violations took place outside the United States," the Court noted, then "the focus test has no filtering role to play." *Id.* at 419 (cleaned up). From that perspective, the Court viewed

---

[6] The Court rejected Hetronic's arguments that the Lanham Act's definition of "commerce" constitutes an unmistakable provision that rebuts the presumption against extraterritoriality. *Abitron*, 600 U.S. at 421 (recalling its similar rebuke to statutory provisions that "reference" foreign commerce as being sufficient to rebut the presumption). The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Hetronic argued that this definition encompasses foreign conduct because Congress lawfully regulates foreign trade under the Foreign Commerce Clause. *Abitron*, 600 U.S. at 420. And Hetronic advanced that the Lanham Act definition differs from "boilerplate" definitions of commerce found in other statutes. *Id.* Together, Hetronic alleged, these features defeated the presumption against extraterritoriality. *Id.*

[7] Abitron argued that the focus is "the 'use' of the mark 'in commerce'"; Hetronic argued that the focus is both to "protect[] mark owners from reputational harm and [to] protect[] consumers from confusion"; and the government argued that the focus is "consumer confusion." *Abitron*, 600 U.S. at 436–37 (Sotomayor, J., concurring in the judgment).

12

"the parties' particular debate over the 'focus' of § 1114(1)(a) and § 1125(a)(1)" as inapposite to "the relevant inquiry" about Abitron's conduct—*where* Abitron had used Hetronic trademarks: the United States or overseas. *Id.* at 422; *see id.* ("The ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus.").

Drilling down on the meaning of "use in commerce," the Court observed that, under the Lanham Act, Congress forbade the unauthorized use of trademarks in commerce under "certain conditions," *id.* at 423, one being that the use "is likely to cause confusion," *id.* (quoting §§ 1114(1)(a), 1125(a)(1)). The Court explained that consumer confusion is a "necessary characteristic of an offending use," but "not a separate requirement." *Id.* So though a likelihood of consumer confusion is part and parcel of any infringing "use in commerce," the keystone for liability is the "specific action" that the alleged infringer took in the United States, and whether that action contravened the Act's focus.[8] *Id.*

---

[8] Justice Sotomayor's concurrence supported Lanham Act penalties extending to "activities carried out abroad" that cause "a likelihood of consumer confusion in the United States." *Abitron*, 600 U.S. at 433 (Sotomayor, J., concurring in the judgment). According to her concurrence— joined by Chief Justice Roberts, Justice Kagan, and Justice Barrett—the statutory focus of § 1114(1)(a) and § 1125(a)(1)(A) is "protecting consumers from confusion." *Id.* at 437. In short, the four concurring justices regarded domestic *confusion* as the sine qua non of the Lanham Act, not domestic *conduct. See id.* at 440–41 (criticizing the majority's citation to Supreme Court cases in which "the focus of the provision at issue *was* conduct" and maintaining that "none of the cases upon which the majority relies establish categorically that there must be domestic conduct in order for there to be a domestic application of [the Act]").

That "particular sort of use" which offends the Lanham Act's focus must be the "premise[] [for] liability." *Id.*

Summing up, the Supreme Court held that a domestic, infringing "'use in commerce' of a trademark" draws "the dividing line between foreign and domestic applications" of the Lanham Act. *Id.* at 428. So with that understanding of the Act's extraterritoriality, we proceed to determine on which side of the dividing line Abitron's conduct falls.

## II.    "Use in Commerce"

For Abitron's foreign conduct to be actionable under the Lanham Act, § 1114(1)(a) and § 1125(a)(1) must apply extraterritorially.[9] The Supreme

---

[9] Sections 1114(1)(a) and 1125(a)(1) technically create two separate claims for relief under the Lanham Act, though we typically group them together when both are raised as part of a Lanham Act trademark-infringement claim because both provisions contain "virtually identical elements." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1050 (10th Cir. 2008); *see Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1070 (10th Cir. 2023) (noting that both § 1114(1) and § 1125(a)(1) impose liability when "the junior user's mark is likely to cause confusion with the senior user's mark" (quoting *Water Pik, Inc. v. Med-Sys. Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013))). Our fellow circuits do the same. *See, e.g.*, *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 616 (5th Cir. 2023) (clarifying that "[t]he same two elements apply to both causes of action," referring to "trademark infringement [allegations] in violation of Sections 32(1) and 43(a) of the Lanham Act, which are codified at 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), respectively"); *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 321 (4th Cir. 2015) (referring to § 1114(1) and § 1125(a) collectively as "[t]he Lanham Act's provisions prohibiting trademark infringement"). The notable difference between the two provisions is that § 1125(a)(1) affords broader protections than § 1114(1)(a), which protects only registered trademarks. *See ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007); *see also Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174

(*footnote continued*)

14

Court resolved that these provisions are not extraterritorial at step one of the framework, so we can immediately proceed to step two. At step two, we first decide the focus of the provisions at issue, § 1114(1)(a) and § 1125(a)(1). "The focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." *WesternGeco*, 585 U.S. at 413–14 (cleaned up) (quoting *Morrison*, 561 U.S. at 267). To assess the object of the Lanham Act's solicitude, we examine the provisions' statutory language.

Broadly speaking, the Lanham Act protects trademark owners by making the infringement or unauthorized use of a registered mark in commerce civilly actionable. *See* 15 U.S.C. § 1127. The Act generally defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade," *id.*, but the provisions specific to trademark infringement, *see* §§ 1114(1)(a), 1125(a)(1), narrow that definition further. Section 1114(1)(a) creates civil liability for any "use in commerce," meaning any use "in connection with the sale, offering for sale, distribution, or advertising of any goods" that is "likely to cause confusion." And § 1125(a)(1) imposes civil liability for "uses in commerce" of any "name [or] symbol" "in connection with any goods or services" that are "likely to cause confusion." From this language, we deduce that the plain focus

---

F.3d 1036, 1046 n.6 (9th Cir. 1999) (illustrating that "the same standard is embodied" in both § 1114(1) and § 1125(a), their application depends only on whether the mark is registered or unregistered).

of § 1114(1)(a) and § 1125(a)(1) is to punish unauthorized commercial uses of U.S.-registered trademarks that harm American businesses and consumers by causing confusion (or a likelihood of confusion) about the true origin of a product. *Cf. Jack Daniel's Props., Inc. v. VIP Products LLC*, 599 U.S. 140, 146 (2023) (explaining that "trademarks benefit consumers and producers alike" because "[a] source-identifying mark enables customers to select 'the goods and services that they wish to purchase, as well as those they want to avoid'" (quoting *Matal v. Tam*, 582 U.S. 218, 224 (2017))).

Having determined the statutory focus, we turn to the relevant conduct implicated under that focus and where that conduct occurred. The relevant conduct under § 1114(1)(a) and § 1125(a)(1) is the use of a trademark "in commerce" "in connection with any goods or services," specifically "the sale, offering for sale, distribution, or advertising," in a manner "likely to cause confusion." Using this yardstick, we assess which of Abitron's allegedly infringing activities amounted to an infringing use of Hetronic trademarks. Once we determine that Abitron has committed an infringing use, we then consider *where* that use occurred—domestically or overseas—before Lanham Act penalties attach. *See* 15 U.S.C. § 1117 (governing Lanham Act damages); *see also 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 412 (2d Cir. 2005) (describing the "use" determination as "a threshold matter" because "no such activity is actionable under the Lanham Act absent the 'use' of a trademark").

16

## A.    Domestic Sales

Last time, we established that the Lanham Act covers Abitron's direct sales to U.S. customers. *Hetronic*, 10 F.4th at 1042–43. These sales blatantly used Hetronic trademarks in domestic commerce, thus no "extraterritorial application of the Act" was required. *Id.* at 1043. On rehearing, Abitron accepts that its "sales to U.S. customers may be subject to the Lanham Act as a domestic application of the law." Suppl. Op. Br. at 7. Abitron instead contests the amount of U.S. sales that triggers Lanham Act liability, asserting that "only a fraction" of them violated the Act because most of its domestic sales posed no likelihood of confusion to U.S. consumers—"a necessary characteristic of an offending use." *Id.* at 7–8 (emphasis omitted) (quoting *Abitron*, 600 U.S. at 423).

From its total direct U.S. sales (€202,134.12), Abitron excises the portion that went to Hetronic's U.S.-based affiliates (€185,463.52), reasoning that those sales "presented no cognizable likelihood of confusion." *Id.* at 9; *see* Suppl. Reply Br. at 4 ("Hetronic knew the goods came from [Abitron], because [Hetronic] bought them from [Abitron]."). At most, Abitron presses, Hetronic's evidence of the confusion stemming from these sales reveals confusion about "whether [the goods] were constructed with the parts Hetronic requested," which goes to the "contractual obligations" between Abitron and Hetronic, not to "*the goods' source*." Suppl. Reply Br. at 4. And to create liability under the Act, Abitron continues, the U.S. sales must have caused a likelihood of

17

confusion "*about [the] source*" of the goods. Suppl. Op. Br. at 9 (quoting *Abitron*, 600 U.S. at 430 (Jackson, J., concurring)). Based on that, Abitron insists that only €16,670.60 of its U.S. sales to "*non-Hetronic* U.S. buyers" were "likely to cause confusion," and so only those sales "can support Lanham Act liability." *Id.* at 8–9.

"In this circuit, likelihood of confusion," as an element of Lanham Act trademark infringement, "is a question of fact." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1114 (10th Cir. 2019) (quoting *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002)). To decide whether "a likelihood of confusion exists," we have identified six nonexhaustive factors: (1) "the degree of similarity between the marks"; (2) "the intent of the alleged infringer in adopting its mark"; (3) "evidence of actual confusion"; (4) "the relation in use and manner of marketing between the goods or services marketed by the competing parties"; (5) "the degree of care likely to be exercised by purchasers"; and (6) "the strength or weakness of the marks." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1239 (10th Cir. 2013); *see also King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999) (explaining that "[a]ll of the factors are interrelated" and that "no one factor is dispositive" because "the weight afforded to some of the factors differs when applied in . . . separate contexts" (citation omitted)).

At trial, the jury received instructions on the multi-pronged likelihood-of-confusion test to determine whether Hetronic had proved that essential element of its trademark-infringement claims against Abitron. Following those instructions, which Abitron never challenged, the jury found "by the greater weight of the evidence [that] each essential element of [the] trademark infringement claim[s]" had been proved.[10] Appellants' App. vol. 10 at 2490–92.

For starters, "[w]e do not and cannot retry factual determinations made by a jury." *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985). On top of that, we review de novo likelihood-of-confusion determinations on summary-judgment appeals, which this is not. *See Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014) (recognizing that though "[l]ikelihood of confusion is a question of fact," it is "amenable to summary judgment in appropriate circumstances"). And even if it were, we would reject Abitron's argument on procedural and substantive grounds.

---

[10] The jury issued a general verdict on the likelihood-of-confusion element through its findings that Hetronic had proved "each essential element of its trademark infringement claim[s]" for the Hetronic mark, product marks, and trade dress. Appellants' App. vol. 10 at 2490–92. The verdict forms did not parse out the disparate levels of confusion Abitron may have caused among Hetronic's U.S. affiliates versus non-Hetronic-affiliated U.S. customers. That lack of granularity in the verdict is hardly surprising because Abitron didn't raise the point at trial. Because Abitron didn't present its case to the jury that way, we decline to rehash the evidence to discern which portions of the trial record do (or don't) support a likelihood-of-confusion finding specific to Hetronic's U.S. affiliates.

Procedurally, this argument is waived. *See Hansen v. PT Bank Negara Indon. (Persero)*, 706 F.3d 1244, 1248 (10th Cir. 2013) ("Plaintiffs never raised this argument before the district court, and it is therefore waived."). Abitron should have disputed before the district court and in its previous appeal that €185,463.52 of its sales lacked the necessary likelihood of confusion.[11] Despite agreeing to the amount of Abitron's direct U.S. sales as a factual matter, Abitron alleges that, legally, Hetronic Germany's sales to Hetronic's U.S. affiliates "presented no cognizable likelihood of confusion" under § 1114(1)(a) or § 1125(a)(1)(A). Suppl. Op. Br. at 9. We decline to let Abitron relitigate the amount of its actionable direct U.S. sales, even as a matter of law, because nothing in the Supreme Court's opinion abrogated or altered the law on the likelihood-of-confusion element for Lanham Act trademark-infringement claims. The Court discussed the likelihood-of-confusion element briefly,[12]

---

[11] Indeed, on appeal last time, Abitron challenged the U.S.-sales figures as a factual matter, alleging that its sales to U.S. customers were de minimis, totaling €16,670.60. We rejected that assertion because Abitron had conceded that its direct U.S. sales totaled €202,134.12 (€16,670.60 from Abitron Germany *and* €185,463.52 from Hetronic Germany) in its statement of undisputed facts submitted with its motion for summary judgment and in an offer of proof at trial. *Hetronic*, 10 F.4th at 1042 n.8.

[12] The majority confirmed that infringing uses in commerce "must create a sufficient risk of confusion," but it focused the extraterritoriality analysis "on the location of the conduct relevant to the [Act's] focus." *Abitron*, 600 U.S. at 422–23. In fact, the majority criticized Justice Sotomayor's concurring view that a domestic application of the Act accrues whenever the use of a mark abroad might incite a likelihood of confusion in the United States, because, the

(*footnote continued*)

mainly to confirm that likelihood of confusion is a "necessary characteristic" of an infringing use. *Abitron*, 600 U.S. at 423. This comment merely clarifies that, though an infringer's domestic conduct dominates the extraterritoriality analysis, a likelihood of consumer confusion remains instrumental for Lanham Act liability in general. *See id.* Because likelihood of confusion was already an essential element for any actionable Lanham Act trademark-infringement claim, and the multi-factor test for likelihood of confusion remains unchanged, Abitron could have argued at trial that €185,463.52 of its direct U.S. sales "create[d] no actionable likelihood of confusion." Suppl. Op. Br. at 8; *see* § 1114(1)(a) (requiring that any liable infringing use be "likely to cause confusion"); § 1125(a)(1)(A) (same). By failing to do so, Abitron has waived that argument on appeal.

Substantively, Abitron contends that the sales to Hetronic's U.S. affiliates "could create no actionable likelihood of confusion" because "Hetronic knew exactly where the goods came from." Suppl. Op. Br. at 8. In Abitron's view, the Lanham Act requires a likelihood of confusion about the

---

majority warned, that approach "threatens to negate the presumption against extraterritoriality." *Id.* at 425.

From this discussion, we glean that likelihood of confusion remains intact as an element of Lanham Act trademark infringement, albeit recognizing that domestic confusion takes a backseat to domestic conduct when considering the Act's extraterritoriality. *See id.* at 422–23. But nothing in the Court's opinion suggests to us that this circuit's well-established likelihood-of-confusion test is inadequate or abrogated. *See id.* at 423.

21

source of the infringing goods that could not have existed here because "Hetronic knew the goods came from [Abitron]." Suppl. Reply Br. at 4.

Contrary to Abitron's position, "the relevant confusion under trademark law is not limited to confusion of consumers as to the source of the goods." *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 835 (10th Cir. 2005). The confusion may also be "as to sponsorship or affiliation" of the goods.[13] *Id.*; *accord Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016) ("[T]he [Lanham] Act's protection against infringement is not limited to any particular type of consumer confusion, much less exclusively to confusion as to source. Rather, [the Act] protects against numerous types of confusion, including confusion regarding affiliation or sponsorship."); *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir. 1984) (stating that the likelihood-of-confusion determination should account "not only" for "confusion of source, but also . . . confusion that results from a mistaken belief in common sponsorship or affiliation").

---

[13] Other circuits agree that if consumers are likely to misunderstand the infringer's product as having been approved or sponsored by the trademark owner, then Lanham Act liability and penalties ensue. *See, e.g.*, *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007) (affirming the district court's finding of confusion based on evidence that "consumer[s] might assume that Perfumebay is part of eBay's web site or one of eBay's internet stores" based on "search results for 'perfume' and 'eBay' that provided links to Perfumebay"); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (determining that Luigino's "use of the term 'Points' on the front" of its packaging "was likely to confuse consumers into believing that Weight Watchers had determined the point values or otherwise endorsed the Luigino's products").

Hetronic presented evidence at trial showing that U.S. customers were confused about the association between Abitron's and Hetronic's products. Hetronic showed that U.S. consumers, and even Abitron's U.S. distributor, thought that Abitron had replaced Hetronic. Hetronic submitted evidence that Abitron sold products with the same shape, appearance, and product name as Hetronic's to assure consumers that they were buying the same products they had bought before. Hetronic produced evidence that Abitron installed counterfeit parts into Hetronic-branded systems without Hetronic's approval or the customers' knowledge, and that those parts sometimes malfunctioned. And Hetronic's evidence revealed that Abitron's online advertising intentionally directed U.S. customers to Abitron for repair services and replacement parts. From this, the jury found that Abitron's activities were likely to have confused Hetronic's U.S. customers about the affiliation between the two companies.

This sort of confusion (or likelihood thereof) suffices to sustain a Lanham Act trademark-infringement claim for all of Abitron's direct U.S. sales. *See Team Tires Plus*, 394 F.3d at 835; *see, e.g.*, *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999) (concluding that confusion existed where the similar branding between two internet databases risked leading consumers to "wrongly assume that the [original] . . . [wa]s no longer offered" and had "been replaced" by the infringer's service). Because even if Hetronic's affiliates knew that Abitron sourced the remotes, part of a mark's core function is to help consumers "quickly and easily"

23

identify that "*this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Jack Daniel's*, 599 U.S. at 146 (citation omitted). That assurance—that the product will possess the same qualities and features that the consumer previously found appealing—vanishes if Abitron sold products masquerading under Hetronic trademarks that varied substantively from those affiliated with the Hetronic brand. Such tactics are a far cry from a consumer purchasing a "disappointing product," as Abitron alleges, Suppl. Op. Br. at 9 (citation omitted), or even from a legitimate attempt to compete by mimicking "successful features" of a product, *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1158 (10th Cir. 2013) (quoting *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 741–42, 745 (2d Cir. 1998)).

We decline to decide at this late stage that €185,463.52 of Abitron's direct U.S. sales posed no likelihood of confusion. This argument is waived and untenable when considered with the jury's findings. We therefore conclude that all of Abitron's direct U.S. sales are actionable under the Lanham Act because these sales used Hetronic trademarks in domestic commerce in a way that threatened confusion among U.S. consumers.

## B.   Foreign Sales

Shifting next to Abitron's foreign sales to foreign customers, Abitron maintains that "[t]hose sales indisputably did not involve a 'domestic' 'use in commerce.'" Suppl. Op. Br. at 10 (quoting *Abitron*, 600 U.S. at 415). In the

24

initial appeal, this panel held that some of Abitron's foreign sales triggered a domestic application of the Lanham Act either because the goods wound up in the United States or the foreign sales diverted customers from Hetronic, costing Hetronic tens of millions of dollars in sales that "would have flowed into the U.S. economy but for [Abitron's] conduct infringing a U.S. trademark." *Hetronic*, 10 F.4th at 1045; *see id.* at 1043–46 (discussing both theories). But neither theory works under the Supreme Court's new framework.

For the €1.7 million of Abitron's foreign sales that "ended up," *id.* at 1043, in the United States, *Abitron* counsels against our assigning significance to the ultimate destination of the infringing goods, *see Abitron*, 600 U.S. at 422. What matters is "the location of the conduct relevant to the focus" of the Act. *Abitron*, 600 U.S. at 422. Above, we identified that focus as the punishment of illegal trademark uses in U.S. commerce detrimental to U.S. businesses and consumers. Considering the location of Abitron's deleterious conduct, we conclude that its foreign sales cannot "premise[] liability" under the Act. *Id.* at 423. That conduct occurred abroad, and so in basing its Lanham Act claims on Abitron's foreign sales, Hetronic seeks an "(impermissible) foreign application of the provision[s]." *Id.* at 418; *see id.* at 419 ("[I]f all the conduct regarding the violations took place outside the United States," then "there would be no domestic conduct that could be relevant to any focus." (cleaned up)). The same goes for the foreign sales that we found actionable under the diversion-of-sales theory. *Hetronic*, 10 F.4th at 1045–46. This

25

conduct falls beyond the Lanham Act's purview even if those sales caused economic losses in the United States.

Because the Court now requires infringing conduct in domestic commerce to anchor any Lanham Act claim, none of Abitron's purely foreign conduct—that is, foreign sales to foreign customers—can premise liability for Hetronic's Lanham Act claims.

### C.    Other Domestic Conduct

Abitron's direct U.S. sales are only one slice of the domestic-conduct pie; below, we dig into the rest.

#### 1.    Advertising, Marketing, Distribution

The Supreme Court instructs us that "the conduct relevant to any potential focus of § 1114(1)(a) and § 1125(a)(1)" is the alleged infringer's domestic "use in commerce" of a registered trademark. *Abitron*, 600 U.S. at 423. And § 1114(1)(a) defines "use in commerce" as "the sale, offering for sale, distributing, or advertising of any goods or services . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive." From this, we understand Abitron's "use[s] in commerce" as going beyond its domestic sales to include any marketing, advertising, and distributing activities that Abitron undertook in the United States. A plain reading of § 1114(1)(a) and § 1125(a)(1) clearly envelops all these actions as "uses in commerce."

Besides, Abitron "does not dispute that [the] 'use' of a mark is broader than sales." Suppl. Reply Br. at 2. So without going further, we hold that

Abitron's domestic advertising, marketing, and distributing—activities that used Hetronic trademarks without authorization and caused a likelihood of confusion among U.S. consumers—all count as infringing "uses in commerce" under the Lanham Act. *See Abitron*, 600 U.S. at 423.

### 2.    Downstream Sales

Beyond Abitron's domestic advertising, marketing, and distributing activities that fall squarely within the text of the Lanham Act, *see* § 1114(1)(a), Hetronic argues that Abitron's infringing products "routinely . . . sold downstream into the United States," Suppl. Resp. Br. at 7, also count as domestic uses in commerce. By "downstream sales," Hetronic refers to the sales from OEMs to end-users in the United States. Hetronic reasons that these "goods [were] *intended* to be sold downstream" and that Abitron "took . . . steps to facilitate downstream sales in the United States," making those sales "sufficiently domestic" for Lanham Act purposes.[14] Suppl. Resp. Br. at 8, 9, 11.

_____

[14] Accounting for these "downstream sales," Hetronic contends that the €1.7 million in sales that "ended up" here are "just the tip of the iceberg." Suppl. Resp. Br. at 9. Hetronic alleges that the €1.7-million figure is underinclusive not overinclusive of Abitron's downstream sales because many more remotes were sold by OEMs to U.S. end-users that were not "indicate[d]" as bound for the United States. *Id.* at 9–10. For example, Hetronic references some of Abitron's foreign sales to Teupen (a Germany-based OEM) that were apparently not marked as "designated for the United States," even though Teupen "sold between 150 and 200 machines in the U.S. market." *Id.* at 10 (cleaned up). From this, Hetronic calculates that as much as €650,000 in Teupen sales are unaccounted for in the €1.7-million figure. *Id.* Abitron contests Hetronic's characterization of the Teupen evidence, countering that these sales were made in the early 2000s "long before any alleged

(*footnote continued*)

27

Hetronic rests this argument largely on Justice Jackson's concurrence in *Abitron*. In her concurrence, Justice Jackson posited that the Lanham Act may protect against the foreign sale of goods bearing an infringing trademark if the goods are resold in the United States. *See Abitron*, 600 U.S. at 430–32 (Jackson, J., concurring).[15]

Abitron challenges both the claim that downstream sales constitute a domestic use in commerce and the persuasive value of Justice Jackson's concurrence. First, "even assuming Hetronic could identify U.S. resales of goods that [Abitron] sold abroad," Abitron argues, "those U.S. resales would . . . be [a] domestic use of the marks in commerce" "*by the reseller*" not "*by defendants*." Suppl. Reply Br. at 8. Second, Abitron insists that because Justice Jackson "joined the Court's opinion in full, without qualification," this panel is not bound by her view of domestic resales as potentially actionable uses in commerce. *Id.*

---

infringement." Suppl. Reply Br. at 7. To the extent that this evidence can be found in the existing record, we defer to the district court to assess its relevance on remand.

[15] Justice Jackson devised a hypothetical about German-made handbags marked "Coache"—replicating the mark of the American-handbag company, "Coach"—resold in the United States by Americans who had bought the bags in Europe. *See Abitron*, 600 U.S. at 431 (Jackson, J., concurring). Under those facts, Justice Jackson concluded that "once the marks on [the German] bags are serving their core source-identifying function in commerce in the United States, this German company is doing—domestically—exactly what Congress sought to proscribe." *See id.*

28

At the outset, we agree that Justice Jackson's concurrence need not alter our approach to the substantive Lanham Act issue partly because, as Abitron says, Justice Jackson joined her majority colleagues "in full," and also because her concurrence advances a different point than the one Hetronic makes.[16]

---

[16] Hetronic urges that Abitron "cannot so easily brush off the views expressed by Justice Jackson," and we agree. Suppl. Resp. Br. at 2. The trouble is that Hetronic misapprehends Justice Jackson's point. Justice Jackson wrote separately from the majority to clarify her view on two things: (1) "what it means to 'use a trademark in commerce'"; and (2) "how that meaning guides the permissible-domestic-application question in a particular case." *Abitron*, 600 U.S. at 429 (Jackson, J., concurring) (brackets omitted). In doing so, she stressed that a "'use in commerce' does not cease at the place . . . where the item to which [the mark] is affixed is first sold" because a use in commerce occurs "wherever the mark serves its source-identifying function." *Id.* at 430. Rooted in that understanding of what is meant by the "use" of a trademark, Justice Jackson employed her German-handbag hypothetical, *supra* note 15, to illustrate that infringing goods do not offend the Lanham Act merely by their presence in the United States. *See id.* at 431. Rather, she explained, goods originally sold abroad become domestically infringing once they are *resold* inside the United States. *See id.* Upon being resold, the goods enter the flow of domestic commerce and so they start doing domestically "what Congress sought to proscribe." *Id.* at 431–32.

Hetronic warps this commentary to assert that Abitron's selling remotes to OEMs abroad "*knowing and intending* that U.S. customers would later buy their products" justifies recovery for those foreign sales. Suppl. Resp. Br. at 11. But, according to Justice Jackson, that's not enough. *See Abitron*, 600 U.S. at 431 (Jackson, J., concurring). Hetronic needed to show that the remotes originally sold abroad were then *resold* inside the United States by U.S. end-users because only then would the goods have begun "serving a source-identifying function *in the way Congress described*." *Id.* at 430 (emphasis added). But Hetronic doesn't make this argument, nor does it introduce any evidence that U.S. end-users ever resold Abitron products in U.S. commerce. Thus, we fail to see how Justice Jackson's concurrence bears on Hetronic's theory of recoverable "downstream sales." This argument is waived for inadequate support and explanation. *See Sinclair Wyoming Refining Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 769 (10th Cir. 2021) (determining that

(*footnote continued*)

29

*Abitron*, 600 U.S. at 432 (Jackson, J., concurring). As to Hetronic's other points about Abitron's downstream sales, none are convincing.

According to Hetronic, "where a foreign entity sells to a foreigner with the expectation that the goods will be sold downstream in the United States, that sale is sufficiently domestic" under the Lanham Act. Suppl. Resp. Br. at 11. We disagree. Products bound for the United States but sold abroad cannot premise a Lanham Act claim without some domestic conduct tying the sales to an infringing use of the mark in U.S. commerce. *See Abitron*, 600 U.S. at 422–23. The *Abitron* majority made clear "that the infringing 'use in commerce' of a trademark creates the dividing line between foreign and domestic applications" of the Lanham Act. *Id.* at 428. Hetronic asks us to stretch that line to include allegedly infringing uses in the United States by other entities, mainly the OEMs' sales to U.S. end-users.[17] *Abitron* doesn't

---

unexplained and unsupported arguments were waived for "inadequate briefing").

[17] For this argument, Hetronic's supplemental brief relies almost exclusively on Justice Jackson's concurrence, which we have established does not bind our analysis. The only other case Hetronic points us to is *Yegiazaryan v. Smagin*, 599 U.S. 533, 545 (2023), specifically for the Supreme Court's observation that "courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury." Suppl. Resp. Br. at 11. But *Yegiazaryan* discussed the domestic-injury requirement for Lanham Act trademark infringement, not whether infringing acts by one foreign entity may impute liability onto another based on knowledge and intent; so *Yegiazaryan* is off-base. *See* 599 U.S. at 544. With that, we make no further comment on Hetronic's claim that because Abitron "sold their knockoff goods *knowing and intending* that U.S. customers would later buy their products," those sales become "domestic." Suppl. Resp. Br. at 11.

support such an elastic interpretation of domestic infringing uses. The *Abitron* majority purposely confined the "ultimate question regarding permissible domestic application[s]" of the Lanham Act to "the location of the conduct relevant to the focus," 600 U.S. at 422, because it worried that broadening the focus inquiry—as Justice Sotomayor envisioned—could allow "almost any claim involving exclusively foreign conduct [to] be repackaged as a 'domestic application,'" *id.* at 425. Hetronic's downstream-sales theory strikes us as the sort of "repackag[ing]" the majority sought to prevent. *Id.* Hetronic needs to keep its eye on the prize: Abitron's infringement of Hetronic trademarks in U.S. commerce.

Hetronic next asserts that the downstream sales create Lanham Act liability because Abitron "took steps to facilitate [the] sales" in the United States—namely, by obtaining FCC licenses and hiring a U.S.-based distributor. Suppl. Resp. Br. at 8. Had Abitron not taken these steps domestically, Hetronic argues, the OEMs would never have bought Abitron's replicas because the spurious remotes could not have been resold in the United States.

This argument resembles the Court's "essential steps" reasoning from *Steele v. Bulova Watch Co.*, where the Court determined that the "[defendant's] activities, when viewed as a whole, f[ell] within the jurisdictional scope of the Lanham Act," 344 U.S. at 285, because the defendant had taken "essential steps" in the United States "in the course of business consummated abroad" that infringed an American company's trademarks, *id.* at 287. There, the defendant

31

bought component parts in the United States for the counterfeit watches that he produced and sold in Mexico. *Id.* at 286. Before *Abitron*, *Steele* was the go-to Supreme Court authority for Lanham Act extraterritoriality. But for a few reasons, the *Abitron* majority jettisoned *Steele* from the analysis. *See Abitron*, 600 U.S. at 421–22.

To start, the majority couched *Steele* as outdated because the *Steele* Court "understandably did not follow the two-step framework [for extraterritoriality] that [the Court] would develop decades later." *Id.* at 422. Next, the Court cast *Steele* as "narrow and factbound" because there, the Court explained, "the defendant committed 'essential steps' in the course of his infringing conduct in the United States" *and* "his conduct was likely to and did cause consumer confusion in the United States." *Id. Steele*'s "implicat[ing] both domestic conduct and a likelihood of domestic confusion" thwarted the *Abitron* Court's ability to discern "which one determines the domestic applications of § 1114(1)(a) and § 1125(a)(1)." *Id.* Because *Steele* couldn't answer that essential question—whether Lanham Act extraterritoriality "turns on" domestic conduct or a likelihood of domestic confusion—the Court "put aside" *Steele* and approached the analysis anew under modern Supreme Court extraterritoriality precedents. *Id.* at 422; *see id.* at 422–23 (pulling from *RJR* and *WesternGeco*). Applying those authorities, the majority concluded that domestic conduct (not confusion) is the hallmark of Lanham Act

32

extraterritoriality. *See id.* at 423. Thus, the Supreme Court's new conduct-focused framework exists completely separate from *Steele*.

Hetronic's contention that Abitron violated the Lanham Act by "t[aking] steps" in the United States "to facilitate" trademark infringement evokes *Steele*'s reasoning.[18] Suppl. Resp. Br. at 8. But post-*Abitron*, *Steele* no longer carries weight in the extraterritoriality analysis. By affirmatively "put[ting] aside" *Steele*, the majority eschewed everything *Steele* stood for: that any "essential steps" taken domestically to facilitate trademark infringement abroad subject infringers to Lanham Act liability. *See Abitron*, 600 U.S. at 422. Under *Abitron*, the Court now requires the defendant to have engaged in "specific action[s]" in U.S. commerce that violate the Act's focus to trigger a domestic application of the Lanham Act. *Id.* at 423. That standard for domestic infringing conduct narrows what the Court set out in *Steele*.

Under the Supreme Court's new framework, we struggle to ascertain how Abitron's acquiring FCC licenses, hiring a U.S. distributor, or repairing a broken part should count as infringing domestic conduct when none of those actions require using Hetronic trademarks in commerce. *Cf. U.S. Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201, 1208–09 (D. Kan. 1998) (rejecting the

---

[18] Hetronic directly invokes *Steele* later in its brief to argue that Abitron "undertook the essential steps of their scheme in the United States," which violated the Lanham Act. Suppl. Resp. Br. at 13. For example, Hetronic points out that Abitron entered into the distribution agreement with Hetronic in the United States. For the reasons explained in this section, we reject any of Hetronic's arguments dependent on *Steele* and its "essential steps" reasoning.

plaintiff's claim that defendant's "conduct in receiving, reprocessing, and returning the instruments" constituted uses in commerce under the Lanham Act); *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 817 (9th Cir. 2021) ("[U]se in commerce within the meaning of the Lanham Act requires use of a genuine character," meaning a use "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind." (citation omitted)). Like the "essential steps" in *Steele*, these behaviors strike us as merely intermediary or incidental to Abitron's foreign infringement because none involve affixing Hetronic's trademark to goods and introducing those goods into U.S. commerce by selling, advertising, marketing, or distributing them to American consumers. *See* §§ 1114(1)(a), 1125(a)(1).

Yet the U.S. distributor's advertising at U.S. tradeshows or marketing Abitron's infringing products online to U.S. customers *would* qualify as domestic infringing uses in commerce under *Abitron*. These activities fall into the same buckets of infringing conduct contemplated by the statute (selling, marketing, advertising, and distributing), and so these uses fit within the domestic reach of the Lanham Act.

We conclude that Abitron's downstream sales do not constitute infringing domestic conduct under the Lanham Act and neither do the steps that Abitron undertook in the United States merely to facilitate foreign infringement. But as established in Section II.A., *supra*, any activities that Abitron engaged in through its U.S. distributor to sell, market, advertise, or distribute infringing

34

goods to U.S. consumers do violate the Lanham Act. Having identified Abitron's infringing conduct under the Supreme Court's framework, we turn to the disgorgement calculation.

## III.  Disgorgement

In the district court, the jury awarded Hetronic nearly $96 million in damages for the profits attributable to Abitron's infringing domestic and foreign sales which, on appeal, we agreed were actionable under the Lanham Act. *See Hetronic*, 10 F.4th at 1027, 1043–46. But after *Abitron*, any portion of that disgorgement award based on Abitron's foreign sales is improper, assuming those sales were unconnected to any infringing use of Hetronic trademarks in domestic commerce. *See* 600 U.S. at 423, 428.

On that ground, Abitron argues that the *Abitron* ruling gouges "99%" of Hetronic's disgorgement award because most of the award was granted under an impermissible extraterritorial application of the Lanham Act based on Abitron's foreign sales. Suppl. Op. Br. at 1, 10. Hetronic disagrees and maintains that, even under the new decision, it can still properly disgorge a significant portion of Abitron's foreign sales. In Hetronic's view, Abitron misunderstands the disgorgement remedy by contending that "a sale to a foreign buyer could never justify disgorgement." Suppl. Resp. Br. at 17. To the contrary, Hetronic asserts, the disgorgement award should account for Abitron's foreign sales that flowed from its domestic infringing conduct, like

advertising.[19] Abitron doesn't dispute this in theory, but it maintains that there is insufficient evidence in the record to tether its foreign sales to its infringing domestic conduct.

We have established that Abitron's infringing "uses in commerce" include its direct U.S. sales, marketing, advertising, and distributing that caused a likelihood of confusion among U.S. consumers. And we have rejected that Abitron's selling to OEMs abroad can premise Lanham Act liability under

---

[19] For support, Hetronic looks to the Supreme Court's statement in *WesternGeco* that a "legal injury" differs from "the damages arising from that injury." Suppl. Resp. Br. at 17 (quoting 585 U.S. at 417). From that observation, Hetronic suggests that so long as it can prove a domestic injury, then the foreign-sales profits arising from that injury would still be recoverable. But Hetronic walks a tightrope in applying *WesternGeco* to its own facts.

In *WesternGeco*, the Court ruled that the petitioner's recovering lost-profits damages from foreign sales was appropriate and not an extraterritorial application of the Patent Act because "it was [the defendant's] domestic act of supplying the components that infringed [the plaintiff's] patents," thus the award for lost foreign sales was nevertheless based on a domestic injury. 585 U.S. at 415–16. In so deciding, the Court rejected the defendant's argument that the Patent Act's application became "extraterritorial" due to "overseas events" and "foreign conduct subsequent to [the] infringement." *Id.* at 416. The Court found that the foreign conduct the defendant identified was "merely incidental to the infringement," and so it lacked the "primacy" required "for purposes of the extraterritoriality analysis." *Id.* (citation omitted).

Hetronic poses virtually the same argument here but in the reverse. Rather than asserting that a domestic application of the Act is truly foreign, Hetronic insists that Abitron's foreign sales transfigure into a domestic injury because of actions taken in the United States that culminated in foreign sales. Heeding the Court's reasoning in *WesternGeco*, we caution that Hetronic cannot use "merely incidental" domestic conduct as a foothold for its Lanham Act claims. *See id.* Only Abitron's foreign-sales profits that flowed *directly* from Hetronic's domestic injuries, as prescribed under § 1114(1)(a) and § 1125(a)(1), may be recovered.

§ 1114(1)(a) and § 1125(a)(1), even if the OEMs later sold the infringing goods to U.S. end-users. Yet we conclude that, if Abitron's foreign sales arose from domestic infringing conduct, then those profits represent the fruits of a domestic injury for which Hetronic may seek disgorgement. That said, to disgorge foreign-sales profits, Hetronic bears the burden of proving the connection between Abitron's domestic infringing conduct and its foreign sales. So before remanding this matter to the district court, we address the parties' relative burdens of proof under the Lanham Act's disgorgement remedy.

A trademark owner who proves infringement under the Lanham Act is entitled to recover damages. *See* 15 U.S.C. § 1117(a). Under § 1117(a), "the registrant of a mark" "shall be entitled . . . to recover," upon "a violation of any right" under the Act, "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," "subject to the principles of equity." As a "prerequisite to recover disgorgement of profits," the plaintiff "must show either actual damages or willful action on the part of the defendant." *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013). Because the jury found that Abitron had willfully infringed Hetronic trademarks, Hetronic's right to recover Abitron's ill-gotten profits is not in question. What remains to be determined is the amount of profits Hetronic may disgorge.

To account for the profits subject to disgorgement, § 1117(a) institutes a burden-shifting scheme under which the plaintiff bears the initial burden to "prove the defendant's sales only," before "the burden shifts to the defendant,"

37

who must then "prove which portion of the sales are not attributable to the [infringing goods]." *Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1244 (10th Cir. 2023) (citation omitted); *accord Dewberry Eng'rs Inc. v. Dewberry Grp., Inc.*, 77 F.4th 265, 292 (4th Cir. 2023) ("A 'plaintiff . . . is not entitled to profits demonstrably not attributable to the unlawful use of his mark." (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942))).

To satisfy its burden, the plaintiff must identify the "total sales" that resulted "from the [defendant's] infringing activity with reasonable certainty." *Klein-Becker*, 711 F.3d at 1163 (citation omitted). To pass "reasonable certainty," the plaintiff must show more than the defendant's gross revenues, though an estimation of infringed profits based on gross revenues is sufficient. *See Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 472 (6th Cir. 2022) (recalling Judge Posner's observation that a plaintiff must do more than adduce an infringer's "corporate income tax return in the record and rest [its] case for an award of infringer's profits" (quoting *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983))); *see also Taylor*, 712 F.2d at 1120, 1122 (discussing the analogous calculation for profits recoverable to victims of copyright infringement under the Copyright Act, 17 U.S.C. § 504(b)); *see also, e.g.*, *Est. of Bishop v. Equinox Int'l Corp.*, 256 F.3d 1050, 1053, 1057 (10th Cir. 2001) (affirming the district court's disgorgement award based on the defendant's total gross profits during the infringement period, along with an

38

estimation of "the net profit attributable to its [infringing] products for the relevant time period"); *Pizza Inn, Inc. v. Odetallah*, No. 21-00322, 2022 WL 17475784, at \*4 (W.D. Okla. Dec. 6, 2022) (concluding that the plaintiff "carried its burden in calculating the proper award of profits" by using the defendant's spreadsheet "containing sales projections and profit forecasting" to estimate the profits attributable to the infringement), *appeal dismissed for lack of jurisdiction*, No. 22-6167, 2022 WL 19404932 (10th Cir. Dec. 6, 2022). Above all, the plaintiff needs to "show *some connection* between the identified 'sales' and the alleged infringement." *Vitamins Online*, 71 F.4th at 1244 (emphasis added) (quoting *Max Rack*, 40 F.4th at 472). Said differently, the plaintiff must show that the defendant's sales were "proximately caused" by the infringement.[20] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014); *see id.* at 140 (holding that the respondent could not "obtain relief" under § 1125(a) "without *evidence* of injury proximately caused by [the petitioner's] alleged misrepresentations"); *see also Atlas Biologicals, Inc. v. Kutrubes*, No. 19-1404, 2022 WL 2840484, at \*4 (10th Cir. 2022) (unpublished) ("As the Supreme Court has explained, Lanham Act liability

---

[20] At oral argument, Hetronic agreed that it bears the burden to prove a "plausible connection" between Abitron's domestic infringing conduct and the foreign sales, which we assume refers to the same proximate-cause requirement discussed in Lanham Act caselaw. Hetronic bears the burden to show proximate causation by a preponderance of the evidence. *See World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006) (noting that every element of a Lanham Act claim must be proved by a preponderance of the evidence).

requires a showing of proximate cause."). So any monetary relief that Hetronic receives must share a causal nexus with Abitron's domestic conduct that used Hetronic trademarks in commerce. *See Vitamins Online*, 71 F.4th at 1242 (affirming the plaintiff's disgorgement award based on a demonstrated "nexus between the false advertising and the lost sales"). Hetronic insists that it can meet its burden on the existing record. As neither side has requested a new trial on the Lanham Act claims, the parties are limited to the existing factual record on remand. Yet the parties may put on limited opinion evidence as necessary for the district court to interpret which of Abitron's domestic activities meet the infringing "uses in commerce" threshold, in light of *Abitron* and this revised opinion.

Lastly, Hetronic requests that "in fashioning relief," the district court should "take into account various other forms of compensation" that Hetronic "declined to pursue," including "attorney's fees and treble damages." Suppl. Resp. Br. at 17–18. We take no stance on this issue. As Hetronic says, it "declined to pursue" these remedies in the district court. *Id. See generally* Proposed Final Judgment, *Hetronic Int'l, Inc. v. Hetronic Ger. GmbH*, No. 14-CV-00650 (W.D. Okla. May 18, 2020), ECF No. 454, Ex. 1. But even if it had, § 1117(a) "gives [the] district court discretion to award treble damages," *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000) (discussing § 1117(a)), and to award reasonable attorneys' fees "in exceptional cases," *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1236

(10th Cir. 2018) (quoting § 1117(a)). We don't need to bestow on the district court discretionary authority it already possesses by statute.

## IV.　Scope of Injunctive Relief

On our first go-round in this case, we narrowed the district court's worldwide injunction to "the countries in which Hetronic currently markets or sells its products." *Hetronic*, 10 F.4th at 1047. On remand, Abitron insists that we must further narrow the injunction to Abitron's activities exclusively within U.S. borders. Abitron asserts that "[b]ecause only a mark's use in commerce *in the United States* could constitute a 'violation' of the Act," we must limit Hetronic's injunctive relief to uses of the mark "*in this country*." Suppl. Op. Br. at 15–16. By the same token, Abitron asks that we order the district court to vacate the sanctions imposed for its "putative violations" of the injunction. *Id.* at 16. Hetronic requests that any injunction issued by this court or the district court "be framed sufficiently broadly" to capture "any [of Abitron's] infringing domestic conduct." Suppl. Resp. Br. at 18.

The Lanham Act empowers the district court to grant injunctive relief "to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116(a). As we've established above, Hetronic's rights were violated when Abitron used Hetronic trademarks in U.S. commerce through its domestic sales, marketing, advertising, and distribution. This list of Abitron's injurious conduct sketches the outer limit for the injunctive relief permitted by § 1116(a). In terms of the injunction's geographical scope, we agree with

41

Abitron that any permanent injunction issued against it cannot extend beyond Abitron's qualifying domestic conduct. We remand to the district court to modify the permanent injunction in accordance with that view.

## V.    State-Law Claims

The jury found for Hetronic on several state-law claims. Abitron never appealed this portion of the verdict. Yet, on rehearing, Abitron asserts what we construe as akin to an objection under Federal Rule of Evidence Rule 403: the jury heard "reams of irrelevant evidence about [Abitron's] foreign conduct" for the Lanham Act claims that tainted its ability to adjudicate the state-law claims. Suppl. Op. Br. at 16, 17. Given the "spillover prejudice" from this allegedly irrelevant evidence, Abitron insists that a new trial is warranted on these claims. *Id.* at 18.

Abitron concedes that it failed to bring this evidentiary issue to our attention last time, despite every opportunity to do so.[21] *See First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1144 (10th Cir. 2017) ("[W]hen a party presents a new argument on appeal and fails to request plain error review, we do not address it."). Likewise, it declined to challenge in the Supreme Court the

---

[21] In its opening brief filed during the original appeal, Abitron requested relief in the form of "a reversal and remand for retrial of the breach of contract judgments and the 5 tort claims," based on the district court's alleged error in "excluding [Abitron's] evidence of 'belief of ownership'" of Hetronic's IP. Op. Br. at 54 ¶ 3. That basis for a retrial differs from the one that Abitron raises now, so its current argument is not preserved.

relief granted under the state-law claims. *Abitron*, 600 U.S. at 446 n.9. This argument is waived.

## CONCLUSION

Beyond the Lanham Act ruling, we see no conflict between our prior opinion in this case and the Supreme Court's decision in *Abitron*. Accordingly, all other aspects of our prior opinion apart from its Lanham Act discussion are reinstated. We also affirm the district court's final judgment on the state-law breach-of-contract and tort claims. As for Hetronic's federal claims under the Lanham Act and the associated remedies, we remand the case to the district court for further proceedings consistent with this revised opinion.